549 F.2d 597
 40 A.L.R.Fed. 314, 1977-1 Trade Cases 61,233
 TIMBERLANE LUMBER CO., Danli Industrial, S.A., Maya Lumber
Co., S. de R.L., Plaintiffs-Appellants,
v.
BANK OF AMERICA, N.T. & S.A., Pedro Casanova E. Hijos, S.A.,
Bank of America Corp., Importadore Mayorista, S. de R.L.,
Michael Casanova, Nasser Bonheur, Manuel Ruis, Louis
Pasmino, Henry Malatesta, Jose Gonzales, Patrick Byrne,
Defendants-Appellees.
Gordon Sloan SMITH, Plaintiff-Appellant,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,
Defendant-Appellee.
Miguel ARDON, Plaintiff-Appellant,
v.
BANK OF AMERICA, N.T. & S.A., Defendant-Appellee.
Jorge LIMA, Plaintiff-Appellant,
v.
BANK OF AMERICA NATIONAL TRUST & SAVINGS ASSN. and Bank of
America Corp., Defendants-Appellees.
 Nos. 74-2142, 74-2354, 74-2812 and 74-2813.
 United States Court of Appeals,
Ninth Circuit.
 Dec. 27, 1976.
As Amended on Denial of Rehearing and Rehearing En Banc March 3, 1977.
 
 John H. Boone, San Francisco, Cal., (argued), Norman R. Allenby (argued), Hillyer & Irwin, San Diego, Cal., for plaintiffs-appellants.
 Noble K. Gregory (argued), Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING and CHOY, Circuit Judges, and GRAY,* District Judge.
 OPINION
 CHOY, Circuit Judge:
 
 
 1
 Four separate actions, arising from the same series of events, were dismissed by the same district court and are consolidated here on appeal. The principal action is Timberlane Lumber Co. v. Bank of America (Timberlane action), an antitrust suit alleging violations of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and the Wilson Tariff Act (15 U.S.C. § 8).[1] This action raises important questions concerning the application of American antitrust laws to activities in another country, including actions of foreign government officials. The district court dismissed the Timberlane action under the act of state doctrine and for lack of subject matter jurisdiction. The other three are diversity tort suits brought by employees of one of the Timberlane plaintiffs for individual injuries allegedly suffered in the course of the extended anti-Timberlane drama. Having dismissed the Timberlane action, the district court dismissed these three suits on the ground of forum non conveniens. We vacate the dismissals of all four actions and remand.
 
 I. The Timberlane Action
 
 2
 The basic allegation of the Timberlane plaintiffs is that officials of the Bank of America and others located in both the United States and Honduras conspired to prevent Timberlane, through its Honduras subsidiaries, from milling lumber in Honduras and exporting it to the United States, thus maintaining control of the Honduran lumber export business in the hands of a few select individuals financed and controlled by the Bank. The intent and result of the conspiracy, they contend, was to interfere with the exportation to the United States, including Puerto Rico, of Honduran lumber for sale or use there by the plaintiffs, thus directly and substantially affecting the foreign commerce of the United States.
 
 Procedural Background
 
 3
 Some of the defendants moved to dismiss the Timberlane action.[2] After a hearing and the submission of memoranda, affidavits, and depositions by both sides, the district court granted the motion in a brief judgment entered on March 20, 1974. The court gave as its reason "that it is prohibited under the act of state doctrine from examining the acts of a foreign sovereign state; and in any event, that there is no direct and substantial effect on United States foreign commerce," the latter apparently being deemed a prerequisite for jurisdiction. No specific findings of fact were announced, nor were any more extensive conclusions of law stated.[3]
 
 
 4
 It is unclear whether the decision was a dismissal for lack of subject matter jurisdiction or for failure to state a claim, F.R.Civ.P. 12(b)(1) & (6), or a summary judgment under F.R.Civ.P. 56. It appears from the transcript of the hearing that the district court and the defendants believed they were acting under Rule 12.[4] Plaintiffs here argue, however, that the defense motion was, in any event, based upon and incorporated affidavits which the court did not exclude, and as such it was a "speaking motion" which must be treated as a motion for summary judgment under the tests of Rule 56. Under Rule 56(e), they contend, they should have been allowed discovery.
 
 
 5
 Affidavits were submitted and cited by the defendants to the district court and again to us. These submissions were not explicitly excluded by the district court. Plaintiffs are correct in their assertion that Rule 12(b) requires Rule 56 treatment when a motion to dismiss for failure to state a claim (Rule 12(b)(6)) is made and "matters outside the pleading are presented to and not excluded by the court." Erlich v. Glasner, 374 F.2d 681 (9th Cir. 1967). A motion to dismiss based on the act of state doctrine raises such a Rule 12(b)(6) objection, not a jurisdictional defect. Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92, 113 (C.D.Cal.1971), aff'd, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).
 
 
 6
 However, it is also true that summary judgment treatment under Rule 56 is not required for a Rule 12(b)(1) "speaking motion." 2A Moore's Federal Practice P 12.09(3), at 2297-2300, 2313 (2d ed. 1975). Therefore, because " speaking motions" to dismiss for want of subject matter jurisdiction are permitted, id. P 12.09(2), at 2288, a dismissal based on affidavits alone without Rule 56 treatment might conceivably be sustainable on this ground.
 
 
 7
 On the other hand, if the district court did hold as its basis for dismissing for lack of subject matter jurisdiction that the alleged facts bore an insufficient relation to the foreign commerce of the United States, that same deficiency could also be considered a ground on which the suit could be dismissed for failure to state a claim under the antitrust laws. See Hospital Building Co. v. Trustees of the Rex Hospital, 425 U.S. 738 742 n.1, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Although the Supreme Court in Hospital Building did not elaborate, it seems settled that, when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous. O'Neill v. Maytag, 339 F.2d 764, 766 & n.3 (2d Cir. 1964). See Bell v. Hood, 327 U.S. 678, 682-83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Such is clearly not the case here.[5]
 
 
 8
 Thus, if the district court dismissed under either Rule 56 itself or Rule 12(b)(6) (the proper motion for a defense pleading either the act of state doctrine or the lack of a sufficient nexus between the alleged violation and our foreign commerce), Rule 56 treatment would seem to have been indicated for the instant case. See also Rule 12(c).
 
 
 9
 Having secured Rule 56 treatment, it does not, however, necessarily follow that plaintiffs were entitled under Rule 56(e) to full discovery. That section provides only that the "court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits." (Emphasis added.) Accordingly, plaintiffs had no general right to discovery under the provisions of Rule 56(e).
 
 
 10
 Nevertheless, we note that the Supreme Court has expressed disapproval of summary disposition in this type of case:
 
 
 11
 We believe that summary procedures should be used sparingly in complex antitrust litigation where motives and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of "even handed justice."
 
 
 12
 Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). Putting plaintiffs to the test in such cases without ample opportunity for discovery is particularly disfavored. Hospital Building, supra 425 U.S. at 746, 96 S.Ct. 1848. From our review of the allegations and affidavits of both sides, it is clear to us that the factual circumstances here involved are indeed complicated. Therefore, in spite of the nonmandatory nature of Rule 56(e), we do not feel that it was proper to dismiss the instant complaint without affording plaintiffs an opportunity for full discovery.[6]
 
 
 13
 Moreover, the affidavits and depositions which were offered to the district court indicate clearly that, at least as to the act of state defense, there remained issues of material fact to be resolved. Thus, summary judgment treatment of that issue would seem to have been inappropriate. As the above-quoted passage from Poller indicates, in-court testimony of witnesses and trial by jury generally are the preferred mode of disposing of cases such as this.
 
 
 14
 The only other possible basis on which the district court could properly have dismissed this suit would have been a ruling that plaintiffs, even with the aid of discovery and the benefit of all doubts on disputed points, could under no circumstances have established a claim for relief. We will, therefore, review the judgment on that basis, treating it as a Rule 12(b)(6) dismissal. Accordingly, we assume the allegations of the Timberlane plaintiffs to be true. Under the circumstances of the instant case, we find pertinent the recent observation of the Supreme Court in Hospital Building :
 
 
 15
 We have held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 78 S.Ct. 99, 102, 2 L.Ed.2d 80, 84 (1957) (footnote omitted). And in antitrust cases, where "the proof is largely in the hands of the alleged conspirators," Poller v. Columbia Broadcasting, 368 U.S. 464, 473 [82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464] (1962), dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. Applying this concededly rigorous standard, we conclude that the instant case is not one in which dismissal should have been granted.
 
 
 16
 Hospital Building, supra, 425 U.S. at 746-47, 96 S.Ct. at 1853.
 
 Cast of Characters
 
 17
 There are three affiliated plaintiffs in the Timberlane action. Timberlane Lumber Company is an Oregon partnership principally involved in the purchase and distribution of lumber at wholesale in the United States and the importation of lumber into the United States for sale and use. Danli Industrial, S.A., and Maya Lumber Company, S. de R.L., are both Honduras corporations, incorporated and principally owned by the general partners of Timberlane. Danli held contracts to purchase timber in Honduras, and Maya was to conduct the milling operations to produce the lumber for export. (Timberlane, Danli, and Maya will be collectively referred to as "Timberlane.")
 
 
 18
 The primary defendants are Bank of America Corporation (Bank), a California corporation, and its wholly-owned subsidiary, Bank of America National Trust and Savings Association, which operates a branch in Tegucigalpa, Honduras. Several employees of the Bank have also been named and served as defendants: Nasser Bonheur, manager of the Tegucigalpa branch from 1970 through January 1972; Jose Gonzales, Bonheur's successor as manager of the Tegucigalpa branch; Luis Pazmino,[7] Regional Vice President for Central America, based in Guatemala City, with authority over the Tegucigalpa branch; and Henry Malatesta, Vice President and Senior Credit Administrator for Central America and the Caribbean, based in San Francisco. Bonheur, Gonzales, Pazmino, and Malatesta are all citizens of the United States.
 
 
 19
 Other defendants have been named, but have not been served. Included in this group are two more Bank employees in Central America: Manuel Ruiz,[8] a citizen of the United States, and Patrick Byrne, a citizen of Canada. Also unserved are two Honduras corporations, Pedro Casanova e Hijos, S.A., and Importadore Mayorista, S. de R.L., and Michael Casanova, a citizen of Honduras (together referred to as "Casanova"), who together represent one of the two main competitors to Timberlane and its predecessor in the Honduran lumber business.
 
 
 20
 Timberlane also cited defendants "Does I to X." Named and served as Doe I, but entering only a special appearance before the district court, was Laureano Gutierrez Falla, a citizen of Honduras and Honduran counsel for both the Bank and Danli during the time of the alleged conspiracy.
 
 
 21
 The Timberlane complaint identified two co-conspirators not named as defendants. Jose Lamas, S. de R.L. (Lamas), a Honduran corporation, is the second major competitor in the lumber business. Jose Caminals Gallego (Caminals), a citizen of Spain, is described as an agent or employee of the Bank in Tegucigalpa.
 
 Facts as Alleged
 
 22
 The conspiracy sketched by Timberlane actually started before the plaintiffs entered the scene. The Lima family operated a lumber mill in Honduras, competing with Lamas and Casanova, in both of which the Bank had significant financial interests. The Lima enterprise was also indebted to the Bank. By 1971, however, the Lima business was in financial trouble. Timberlane alleges that driving Lima under was the first step in the conspiracy which eventually crippled Timberlane's efforts, but the particulars do not matter for this appeal. What does matter is that various interests in the Lima assets, including its milling plant, passed to Lima's creditors: Casanova, the Bank, and the group of Lima employees who had not been paid the wages and severance pay due them. Under Honduran law, the employees' claim had priority.
 
 
 23
 Enter Timberlane, with a long history in the lumber business, in search of alternative sources of lumber for delivery to its distribution system on the East Coast of the United States. After study, it decided to try Honduras. In 1971, Danli was formed, tracts of forest land were acquired, plans for a modern log-processing plant were prepared, and equipment was purchased and assembled for shipment from the United States to Danli in Honduras. Timberlane became aware that the Lima plant might be available and began negotiating for its acquisition. Maya was formed, purchased the Lima employees' interest in the machinery and equipment in January 1972, despite opposition from the conspirators, and re-activated the Lima mill.
 
 
 24
 Realizing that they were faced with better-financed and more vigorous competition from Timberlane and its Honduran subsidiaries, the defendants and others extended the anti-Lima conspiracy to disrupt Timberlane's efforts. The primary weapons employed by the conspirators were the claim still held by the Bank in the remaining assets of the Lima enterprise under the all-inclusive mortgage Lima had been forced to sign and another claim held by Casanova. Maya made a substantial cash offer for the Bank's interest in an effort to clear its title, but the Bank refused to sell. Instead, the Bank surreptitiously conveyed the mortgage to Casanova for questionable consideration, Casanova paying nothing and agreeing only to pay the Bank a portion of what it collected. Casanova immediately assigned the Bank's claim and its own on similar terms to Caminals, who promptly set out to disrupt the Timberlane operation.
 
 
 25
 Caminals is characterized as the "front man" in the campaign to drive Timberlane out of Honduras, with the Bank and other defendants intending and carrying responsibility for his actions. Having acquired the claims of Casanova and the Bank, Caminals went to court to enforce them, ignoring throughout Timberlane's offers to purchase or settle them. Under the laws of Honduras, an "embargo" on property is a court-ordered attachment, registered with the Public Registry, which precludes the sale of that property without a court order. Honduran law provides, upon embargo, that the court appoint a judicial officer, called an "interventor" to ensure against any diminution in the value of the property. In order to paralyze the Timberlane operation, Caminals obtained embargoes against Maya and Danli. Acting through the interventor, since accused of being on the payroll of the Bank, guards and troops were used to cripple and, for a time, completely shut down Timberlane's milling operation. The harassment took other forms as well: the conspirators caused the manager of Timberlane's Honduras operations, Gordon Sloan Smith, to be falsely arrested and imprisoned and were responsible for the publication of several defamatory articles about Timberlane in the Honduran press.
 
 
 26
 As a result of the conspiracy, Timberlane's complaint claimed damages then estimated in excess of $5,000,000. Plaintiffs also allege that there has been a direct and substantial effect on United States foreign commerce, and that defendants intended the results of the conspiracy, including the impact on United States commerce.[9]
 
 Act of State
 
 27
 The classic enunciation of the act of state doctrine is found in Underhill v. Hernandez, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):
 
 
 28
 Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one county will not sit in judgment on the acts of the government of another done within its own territory.
 
 
 29
 From the beginning, this principle has been applied in foreign trade antitrust cases. In American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), the first such case of significance, the American owner of a banana plantation caught in a border dispute between Panama and Costa Rica claimed that a competitor violated the Sherman Act by persuading the Costa Rican government to seize his lands. The act complained of would have required an adjudication of the legality of the Costa Rican seizure, an action which the Supreme Court said our courts could not challenge. More recently, see Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92 (C.D.Cal.1971), affirmed 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972), the case mentioned from the bench by the district court here in ruling in favor of the defense motion to dismiss.
 
 
 30
 The defendants argue as the district court apparently held that the injuries allegedly suffered by Timberlane resulted from acts of the Honduran government, principally in connection with the enforcement of the security interests in the Maya plant, which American courts cannot review. Such an application of the act of state doctrine seems to us to be erroneous. Even if the coup de grace to Timberlane's enterprise in Honduras was applied by official authorities, we do not agree that the doctrine necessarily shelters these defendants or requires dismissal of the Timberlane action.
 
 
 31
 The leading modern statement of the act of state doctrine appears in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Despite contrary implications in Underhill and American Banana, the Court concluded that the doctrine was not compelled by the nature of sovereignty, by international law, or by the text of the Constitution. 376 U.S. at 421-23, 84 S.Ct. 923. Rather, it derives from the judiciary's concern for its possible interference with the conduct of foreign affairs by the political branches of the government:
 
 
 32
 The doctrine as formulated in past decisions expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.
 
 
 33
 Id. at 423, 84 S.Ct. at 938. The Court recognized that not every case is identical in its potential impact on our relations with other nations. For instance:
 
 
 34
 (S)ome aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.
 
 
 35
 Id. at 428, 84 S.Ct. at 940. Thus the Court explicitly rejected "laying down or reaffirming an inflexible and all-encompassing rule." Id. Whether forbearance by an American court in a given situation is advisable or appropriate depends upon the "balance of relevant considerations." Id.
 
 
 36
 It is apparent that the doctrine does not bestow a blank-check immunity upon all conduct blessed with some imprimatur of a foreign government. In Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the Canadian government had made a private corporation its exclusive agent for the purchase of vanadium, a material used in steel production. The Canadian corporation, acting in concert with an affiliated American company, used its position to exclude a competitor of the American affiliate from the Canadian market. The Court held that the Canadian corporation's activity was not entitled to immunity, carefully noting that the plaintiff did not question the validity of any action taken by the Canadian government and that there was no indication that any Canadian government official "approved or would have approved" of the monopolizing efforts. Id. at 706, 82 S.Ct. 1404.
 
 
 37
 In Alfred Dunhill of London, Inc. v. The Republic of Cuba, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), interventors appointed by the Cuban government to take possession of and operate nationalized Cuban cigar manufacturers had been paid large sums by importers in the United States and elsewhere for pre-nationalization shipments. These payments were found to have been made in error, since they should have been made to the prior owners of the cigar firms. The importers sought to recover the money. Counsel for the Cuban government and the interventors argued that the interventors' refusal to repay the pre-intervention sums represented a sovereign repudiation of any obligation to refund the amounts and as such an act of state not subject to challenge in American courts. The Court disagreed, refusing to conclude that "the conduct in question was the public act of those with authority to exercise sovereign authority and was entitled to respect in our courts." Id. at 694, 96 S.Ct. at 1861. There was no proof that the failure of the interventors to repay the money reached the level of an "act of state," a sovereign assertion of the Cuban government:
 
 
 38
 No statute, decree, order or resolution of the Cuban government itself was offered in evidence indicating that Cuba had repudiated her obligations in general or any class thereof or that she had as a sovereign matter determined to confiscate the amounts due three foreign importers.
 
 
 39
 Id.
 
 
 40
 A corollary to the act of state doctrine in the foreign trade antitrust field is the often-recognized principle that corporate conduct which is compelled by a foreign sovereign is also protected from antitrust liability, as if it were an act of the state itself. Thus, in Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F.Supp. 1291 (D.Del.1970), a refusal by defendants to sell Venezuelan crude oil to plaintiff was held not to be an illegal restraint of trade because it was a complete defense that the Venezuelan government had imposed a boycott forbidding such sales. The court there observed that "(w) hen a nation compels a trade practice, firms there have no choice but to obey. Acts of business become effectively acts of the sovereign." Id. at 1298.
 
 
 41
 On the other hand, mere governmental approval or foreign governmental involvement which the defendants had arranged does not necessarily provide a defense. In United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), the defendants were accused of conspiring to monopolize sales of sisal, a material used in making rope, from Mexico to the United States by inducing Mexican officials to recognize the conspirators as the exclusive traders and to impose discriminatory taxes on rival sellers. The Court rejected the defendants' claim to act of state protection, ruling that a conspiracy formed in the United States for the purpose of monopolizing sales to the United States was not protected simply because one element of the conspiracy involved securing favorable action by foreign officials. In Continental Ore, the Court indicated that it continued to accept the Sisal reasoning. See 370 U.S. at 705, 82 S.Ct. 1404.
 
 
 42
 The distinction was recognized and relied upon in United States v. The Watchmakers of Switzerland Information Center, Inc., 1963 Trade Cases P 70,60 0 (S.D.N.Y.1962), order modified, 1965 Trade Cases P 70,352 (S.D.N.Y.1965), the "Swiss Watch" case:
 
 
 43
 If, of course, the defendants' activities had been required by Swiss law, this court could indeed do nothing. An American court would have under such circumstances no right to condemn the governmental activity of another sovereign nation. In the present case, however, the defendants' activities were not required by the laws of Switzerland. They were agreements formulated privately without compulsion on the part of the Swiss Government. It is clear that these private agreements were then recognized as facts of economic and industrial life by that nation's government. Nonetheless, the fact that the Swiss Government may, as a practical matter, approve of the effects of this private activity cannot convert what is essentially a vulnerable private conspiracy into an unassailable system resulting from foreign governmental mandate.
 
 
 44
 See Davidow, Antitrust, Foreign Policy, and International Buying Cooperation, 84 Yale L.J. 268, 282-83 (1974); W. Fugate, Foreign Commerce and the Antitrust Laws 75-82 (2d ed. 1973); Kintner & Hallgarten, Application of United States Antitrust Laws to Foreign Trade and Commerce, 15 B.C. Ind. & Com.L.Rev. 343, 356-58 (1973).[10]
 
 
 45
 The touchstone of Sabbatino the potential for interference with our foreign relations is the crucial element in determining whether deference should be accorded in any given case. We wish to avoid "passing on the validity" of foreign acts. Sabbatino, 376 U.S. at 423, 84 S.Ct. 923. Similarly, we do not wish to challenge the sovereignty of another nation, the wisdom of its policy, or the integrity and motivation of its action. On the other hand, repeating the terms of Sabbatino, at 428, 84 S.Ct. at 940, "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."
 
 
 46
 While we do not wish to impugn or question the nobility of a foreign nation's motivation, we are necessarily interested in the depth and nature of its interest. The Restatement (Second) of Foreign Relations Law of the United States § 41 (1965) makes an important distinction on this basis in limiting the deference of American courts:
 
 
 47
 (A) court in the United States . . . will refrain from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interests. (Emphasis added.)
 
 
 48
 The "public interest" qualification is intentional and significant in the context of Timberlane's action, as a comment to § 41 makes plain:
 
 
 49
 Comment d. Nature of act of state. An "act of state" as the term is used in this Title involves the public interests of a state as a state, as distinct from its interest in providing the means of adjudicating disputes or claims that arise within its territory. . . . A judgment of a court may be an act of state. Usually it is not, because it involves the interests of private litigants or because court adjudication is not the usual way in which the state exercises its jurisdiction to give effect to public interests.
 
 Id. at 127.[11]
 
 50
 On the basis of the foregoing analysis, we conclude that the court below erred in dismissing the instant suit on the authority of Occidental Petroleum Corp. v. Buttes Gas & Oil Co., 331 F.Supp. 92, 108-13 (C.D.Cal. 1971), aff'd, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). The actions of the Honduran government that are involved here including the application by its courts and their agents of the Honduran laws concerning security interests and the protection of the underlying property against diminution are clearly distinguishable from the sovereign decrees laying claim to off-shore waters that were at issue in Occidental Petroleum, see 331 F.Supp. at 99-101 & n.11. Here, the allegedly "sovereign" acts of Honduras consisted of judicial proceedings which were initiated by Caminals, a private party and one of the alleged co-conspirators, not by the Honduran government itself. Unlike the Occidental Petroleum plaintiffs, see id. at 110, Timberlane does not seek to name Honduras or any Honduran officer as a defendant or co-conspirator, nor does it challenge Honduran policy or sovereignty in any fashion that appears on its face to hold any threat to relations between Honduras and the United States. In fact, there is no indication that the actions of the Honduran court and authorities reflected a sovereign decision that Timberlane's efforts should be crippled or that trade with the United States should be restrained. Compare Alfred Dunhill of London, Inc. v. The Republic of Cuba, 425 U.S. at 695, 96 S.Ct. 1854. Moreover, and once again unlike the situation in Occidental Petroleum, see 331 F.Supp. at 109-10 n. 28, plaintiffs here apparently complain of additional agreements and actions which are totally unrelated to the Honduran government. These separate activities would clearly be unprotected even if procurement of a Honduran act of state were one part of defendants' overall scheme. Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. at 704-05, 82 S.Ct. 1404; United States v. Sisal, 274 U.S. at 275-76, 47 S.Ct. 592.
 
 
 51
 Under these circumstances, it is clear that the "act of state" doctrine does not require dismissal of the Timberlane action.
 
 
 52
 Extraterritorial Reach of the United States Antitrust Laws
 
 
 53
 There is no doubt that American antitrust laws extend over some conduct in other nations.[12] There was language in the first Supreme Court case in point, American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), casting doubt on the extension of the Sherman Act to acts outside United States territory. But subsequent cases have limited American Banana to its particular facts, and the Sherman Act and with it other antitrust laws has been applied to extraterritorial conduct. See, e. g., Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); United States v. Sisal Sales Corp., 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927); United States v. Aluminum Co. of America, 148 F.2d 416, (2d Cir. 1945) (the "Alcoa" case).[13] The act may encompass the foreign activities of aliens as well as American citizens. Alcoa, supra; Swiss Watch, 1963 Trade Cases P 70,600; United States v. General Electric Co., 82 F.Supp. 753 (D.N.J.1949), judgment implementing decree, 115 F.Supp. 835 (D.N.J.1953).
 
 
 54
 That American law covers some conduct beyond this nation's borders does not mean that it embraces all, however. Extraterritorial application is understandably a matter of concern for the other countries involved. Those nations have sometimes resented and protested, as excessive intrusions into their own spheres, broad assertions of authority by American courts. See A. Neale, The Antitrust Laws of the United States of America 365-72 (2d ed. 1970); Assn. of the Bar of the City of New York, National Security and Foreign Policy in the Application of American Antitrust Laws to Commerce with Foreign Nations 7-18 (1957); Zwarensteyn, The Foreign Reach of the American Antitrust Laws, 3 Am.Bus.L.J. 163, 165-69 (1965). Our courts have recognized this concern and have, at times, responded to it, even if not always enough to satisfy all the foreign critics. See Alcoa, 148 F.2d at 443; Swiss Watch, 1965 Trade Cases P 71,352 (modification of order); General Electric, 115 F.Supp. at 878 (implementation of decree). In any event, it is evident that at some point the interests of the United States are too weak and the foreign harmony incentive for restraint too strong to justify an extraterritorial assertion of jurisdiction.
 
 
 55
 What that point is or how it is determined is not defined by international law. Miller, Extraterritorial Effects of Trade Regulation, 111 U.Pa.L.Rev. 1092, 1094 (1963). Nor does the Sherman Act limit itself.[14] In the domestic field the Sherman Act extends to the full reach of the commerce power. United States v. South-Eastern Underwriters Assn., 322 U.S. 533, 558, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). To define it somewhat more modestly in the foreign commerce area courts have generally, and logically, fallen back on a narrower construction of congressional intent, such as expressed in Judge Learned Hand's oft-cited opinion in Alcoa, 148 F.2d at 443:
 
 
 56
 (T)he only question open is whether Congress intended to impose the liability and whether our own Constitution permitted it to do so: as a court of the United States we cannot look beyond our own law. Nevertheless, it is quite true that we are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the "Conflict of Laws." We should not impute to Congress an intent to punish all whom its courts can catch, for conduct which has no consequences within the United States.
 
 
 57
 It is the effect on American foreign commerce which is usually cited to support extraterritorial jurisdiction. Alcoa set the course, when Judge Hand declared, id.:
 
 
 58
 (I)t is settled law . . . that any state may impose liabilities, even upon persons not within its allegiance, for conduct outside its borders that has consequences within its borders which the state reprehends; and these liabilities other states will ordinarily recognize.[15]
 
 
 59
 Despite its description as "settled law," Alcoa's assertion has been roundly disputed by many foreign commentators as being in conflict with international law, comity, and good judgment.[16] Nonetheless, American courts have firmly concluded that there is some extraterritorial jurisdiction under the Sherman Act.
 
 
 60
 Even among American courts and commentators, however, there is no consensus on how far the jurisdiction should extend. The district court here concluded that a "direct and substantial effect" on United States foreign commerce was a prerequisite, without stating whether other factors were relevant or considered. The same formula was employed, to some extent, by the district courts in the Swiss Watch case, 1963 Trade Cases P 70,600, in United States v. R. P. Oldham Co., 152 F.Supp. 818, 822 (N.D.Cal.1957), and in General Electric, 82 F.Supp. at 891.[17] It has been identified and advocated by several commentators. See, e. g., W. Fugate, Foreign Commerce and the Antitrust Laws 30, 174 (2d ed. 1973); J. Van Cise, Understanding the Antitrust Laws 204 (1973 ed.). See also Report of the Attorney General's National Committee to Study the Antitrust Laws 76 (1955) ("substantial anticompetitive effects"); Restatement (Second) of Foreign Relations Law of the United States § 18.[18]
 
 
 61
 Other courts have used different expressions, however. See, e. g., Thomsen v. Cayser, 243 U.S. 66, 88, 37 S.Ct. 353, 360, 61 L.Ed. 597 (1917) ("the combination affected the foreign commerce of this country"); Alcoa, 148 F.2d at 444 ("intended to affect imports and exports (and) . . . is shown actually to have had some effect on them");[19] United States v. Imperial Chemical Industries, Ltd., 100 F.Supp. 504, 592 (S.D.N.Y.1951) ("a conspiracy . . . which affects American commerce"); United States v. Timken Roller Bearing Co., 83 F.Supp. 284, 309 (N.D.Ohio 1949), modified and affirmed, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951) ("a direct and influencing effect on trade"). See also citations in 1 J. von Kalinowski, Antitrust Law and Trade Regulation § 5.02(2), at 5-120.
 
 
 62
 Different standards have been urged by other commentators. Julian von Kalinowski, id. at 5-122, advocates a "direct or substantial" effect test "any effect that is not both insubstantial and indirect" should support jurisdiction, a view that was adopted by the district court in Occidental Petroleum v. Buttes Gas & Oil Co., 331 F.Supp. 92, 102-03 (C.D.Cal.1971), affirmed on other grounds, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). James Rahl turns away from a flat requirement of effects by concluding that the Sherman Act should reach a restraint either "(1) if it occurs in the course of foreign commerce, or (2) if it substantially affects either foreign or interstate commerce." Rahl, Foreign Commerce Jurisdiction of the American Antitrust Laws, 43 Antitrust L.J. 521, 523 (1974).[20] In essence, as Dean Rahl observes, "(t)here is no agreed black-letter rule articulating the Sherman Act's commerce coverage" in the international context. Id.
 
 
 63
 Few cases have discussed the nature of the effect required for jurisdiction, perhaps because most of the litigated cases have involved relatively obvious offenses and rather significant and apparent effects on competition within the United States. Id.; P. Areeda, Antitrust Analysis 129 n.455 (1974). It is probably in part because the standard has not often been put to a real test that it seems so poorly defined. William Fugate, who has identified the "direct and substantial" standard as the rule, has described the meaning of that phrase as being "quite broad." W. Fugate, supra, at 174. What the threshold of significance is, however, has not been identified.[21] Nor is it quite clear what the "direct-indirect" distinction is supposed to mean.[22] It might well be, as was said in the context of transnational securities regulation:
 
 
 64
 Although courts have spoken in terms of the Restatement and of congressional policy, findings that an American effect was direct, substantial, and foreseeable, or within the scope of congressional intent, have little independent analytic significance. Instead, cases appear to turn on a reconciliation of American and foreign interests in regulating their respective economies and business affairs . . . .
 
 
 65
 Note, American Adjudication of Transnational Securities Fraud, 89 Harv.L.Rev. 553, 563 (1976).
 
 
 66
 Implicit in that observation, as it is in several of the cases and commentaries employing the "effects" test, is the suggestion that factors other than simply the effect on the United States are weighed, and rightly so. As former Attorney General (then Professor) Katzenbach observed, the effect on American commerce is not, by itself, sufficient information on which to base a decision that the United States is the nation primarily interested in the activity causing the effect. "(A)nything that affects the external trade and commerce of the United States also affects the trade and commerce of other nations, and may have far greater consequences for others than for the United States." Katzenbach, Conflicts on an Unruly Horse, 65 Yale L.J. 1087, 1150 (1956).
 
 
 67
 The effects test by itself is incomplete because it fails to consider other nations' interests.[23] Nor does it expressly take into account the full nature of the relationship between the actors and this country. Whether the alleged offender is an American citizen, for instance, may make a big difference; applying American laws to American citizens raises fewer problems than application to foreigners. As was observed in Pacific Seafarers, Inc. v. Pacific Far East Line, Inc., 131 U.S.App.D.C. 226, 404 F.2d 804, 815 (1968), cert. denied, 393 U.S. 1093, 89 S.Ct. 872, 21 L.Ed.2d 784 (1969):
 
 
 68
 If . . . (American antitrust) policy cannot extend to the full sweep of American foreign commerce because of the international complications involved, then surely the test which determines whether United States law is applicable must focus on the nexus between the parties and their practices and the United States, not on the mechanical circumstances of effect on commodity exports or imports.
 
 
 69
 American courts have, in fact, often displayed a regard for comity and the prerogatives of other nations and considered their interests as well as other parts of the factual circumstances,[24] even when professing to apply an effects test.[25] To some degree, the requirement for a "substantial" effect may silently incorporate these additional considerations, with "substantial" as a flexible standard that varies with other factors. The intent requirement suggested by Alcoa, 148 F.2d at 443-44, is one example of an attempt to broaden the court's perspective, as is drawing a distinction between American citizens and non-citizens.[26]
 
 
 70
 The failure to articulate these other elements in addition to the standard effects analysis is costly, however, for it is more likely that they will be overlooked or slighted in interpretating past decisions and reaching new ones. Placing emphasis on the qualification that effects be "substantial" is also risky, for the term has a meaning in the interstate antitrust context which does not encompass all the factors relevant to the foreign trade case.
 
 
 71
 Indeed, that "substantial effects" element of interstate antitrust analysis may well be responsible for the use of an effects test for foreign commerce. The Sherman Act reaches restraints directly intended to limit the flow of interstate trade or whose sole impact is on interstate commerce, but it also reaches "wholly local business restraints" if the particular restraint "substantially and adversely affects interstate commerce." Hospital Building, 425 U.S. at 743, 96 S.Ct. at 1852; Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); United States v. Employing Plasterers Assn., 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954). Such a test is necessary in the interstate context to separate the restraints which fall within the federal ambit under the interstate commerce clause from those which, as purely intrastate burdens, remain the province of the states. See, e. g., Boddicker v. Arizona State Dental Health Ass'n, No.549 F.2d 626, 629-30 (9th Cir.); Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 521-24 (9th Cir. 1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973). Since, however, no comparable constitutional problem exists in defining the scope of congressional power to regulate foreign commerce, it may be unwise blindly to apply the "substantiality" test to the international setting. See Occidental Petroleum, 331 F.Supp. at 102 n.13; 1 J. Kalinowski, supra, § 502(2), at 5-121. Only respect for the role of the executive and for international notions of comity and fairness limit that constitutional grant.
 
 
 72
 A tripartite analysis seems to be indicated. As acknowledged above, the antitrust laws require in the first instance that there be some effect actual or intended on American foreign commerce before the federal courts may legitimately exercise subject matter jurisdiction under those statutes. Second, a greater showing of burden or restraint may be necessary to demonstrate that the effect is sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil violation of the antitrust laws. Occidental Petroleum, 331 F.Supp. at 102-03; Beausang, The Extraterritorial Jurisdiction of the Sherman Act, 70 Dick.L.Rev. 187, 191 (1966). Third, there is the additional question which is unique to the international setting of whether the interests of, and links to, the United States including the magnitude of the effect on American foreign commerce are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority.
 
 
 73
 It is this final issue which is both obscured by undue reliance on the "substantiality" test and complicated to resolve. An effect on United States commerce, although necessary to the exercise of jurisdiction under the antitrust laws, is alone not a sufficient basis on which to determine whether American authority should be asserted in a given case as a matter of international comity and fairness. In some cases, the application of the direct and substantial test in the international context might open the door too widely by sanctioning jurisdiction over an action when these considerations would indicate dismissal. At other times, it may fail in the other direction, dismissing a case for which comity and fairness do not require forebearance, thus closing the jurisdictional door too tightly for the Sherman Act does reach some restraints which do not have both a direct and substantial effect on the foreign commerce of the United States. A more comprehensive inquiry is necessary. We believe that the field of conflict of laws presents the proper approach, as was suggested, if not specifically employed, in Alcoa in expressing the basic limitation on application of American laws:
 
 
 74
 (W)e are not to read general words, such as those in this Act, without regard to the limitations customarily observed by nations upon the exercise of their powers; limitations which generally correspond to those fixed by the "Conflict of Laws."
 
 
 75
 148 F.2d at 443. The same idea is reflected in Restatement (Second) of Foreign Relations Law of the United States § 40:
 
 
 76
 Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction . . . .[27]
 
 
 77
 The act of state doctrine discussed earlier demonstrates that the judiciary is sometimes cognizant of the possible foreign implications of its action. Similar awareness should be extended to the general problems of extraterritoriality. Such acuity is especially required in private suits, like this one, for in these cases there is no opportunity for the executive branch to weigh the foreign relations impact, nor any statement implicit in the filing of the suit that that consideration has been outweighed.[28]
 
 
 78
 What we prefer is an evaluation and balancing of the relevant considerations in each case in the words of Kingman Brewster, a "jurisdictional rule of reason."[29] Balancing of the foreign interests involved was the approach taken by the Supreme Court in Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), where the involvement of the Canadian government in the alleged monopolization was held not to require dismissal. The Court stressed that there was no indication that the Canadian authorities approved or would have approved of the monopolization, meaning that the Canadian interest, if any, was slight and was outweighed by the American interest in condemning the restraint.[30] Similarly, in Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254 (1953), the Court used a like approach in declining to apply the Jones Act to a Danish seaman, injured in Havana on a Danish ship, although he had signed on to the ship in New York.
 
 
 79
 The elements to be weighed include the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of businesses or corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.[31] A court evaluating these factors should identify the potential degree of conflict if American authority is asserted. A difference in law or policy is one likely sore spot, though one which may not always be present.[32] Nationality is another; though foreign governments may have some concern for the treatment of American citizens and business residing there, they primarily care about their own nationals.[33] Having assessed the conflict, the court should then determine whether in the face of it the contacts and interests of the United States are sufficient to support the exercise of extraterritorial jurisdiction.[34]
 
 
 80
 We conclude, then, that the problem should be approached in three parts: Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States? Is it of such a type and magnitude so as to be cognizable as a violation of the Sherman Act? As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover it? The district court's judgment found only that the restraint involved in the instant suit did not produce a direct and substantial effect on American foreign commerce. That holding does not satisfy any of these inquiries.
 
 
 81
 The Sherman Act is not limited to trade restraints which have both a direct and substantial effect on our foreign commerce. Timberlane has alleged that the complained of activities were intended to, and did, affect the export of lumber from Honduras to the United States the flow of United States foreign commerce, and as such they are within the jurisdiction of the federal courts under the Sherman Act. Moreover, the magnitude of the effect alleged would appear to be sufficient to state a claim.[35]
 
 
 82
 The comity question is more complicated. From Timberlane's complaint it is evident that there are grounds for concern as to at least a few of the defendants, for some are identified as foreign citizens: Laureano Gutierrez Falla, Michael Casanova and the Casanova firms, of Honduras, and Patrick Byrne, of Canada. Moreover, it is clear that most of the activity took place in Honduras, though the conspiracy may have been directed from San Francisco, and that the most direct economic effect was probably on Honduras. However, there has been no indication of any conflict with the law or policy of the Honduran government, nor any comprehensive analysis of the relative connections and interests of Honduras and the United States. Under these circumstances, the dismissal by the district court cannot be sustained on jurisdictional grounds.
 
 
 83
 We, therefore, vacate the dismissal and remand the Timberlane action.II. The Smith, Ardon, and Lima Actions
 
 
 84
 Three employees of Maya in Honduras allege that they were personally injured in the course of the conspirators' harassment of Timberlane and have filed tort suits against the Bank and its corporate parent. Gordon Sloan Smith, a citizen of Canada and a resident of Honduras from 1971 through 1973 and of Miami since, asserts charges of malicious prosecution, abuse of process, and theft of personal property. Miguel Ardon and Jorge Lima are both citizens of Honduras, and both allege claims of malicious prosecution and abuse of process. Pursuant to local court rules, these suits were reassigned to the same district judge who had handled the Timberlane antitrust action, which by that time had already been dismissed. Shortly thereafter, the court granted the Bank's motion to dismiss the three suits on the ground of forum non conveniens.
 
 
 85
 Dismissal on the basis of forum non conveniens is within the district court's power. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). The fact that there is no lack of jurisdiction or mistake of venue does not foreclose application of the doctrine; indeed, proper jurisdiction and venue are assumed.
 
 
 86
 Gulf Oil noted that the decision falls within the discretion of the district court, but observed that "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Id. at 508-09, 67 S.Ct. at 843. The Court also outlined some of the factors, reflecting both the private interests of the litigants and the public interests, to be weighed, a compendium we need not repeat.
 
 
 87
 Given the circumstances existing at the time of the dismissal, we would be reluctant to say that the district court abused its discretion. The alleged torts took place in Honduras. Most of the witnesses and evidence are apparently based there, as are two of the plaintiffs, and Honduran law would have to be applied. The only particular interest of the Northern District of California is that the Bank is headquartered there.
 
 
 88
 We need not make that decision, however, since the relevant circumstances have changed in the meantime. These three suits were evaluated by the district court after the Timberlane action had already been dropped. That action having been revived and remanded, it may be convenient and more efficient for the same court to hear these suits. We do not make that determination ourselves, but we believe that the circumstances have changed sufficiently to justify vacating the dismissals and remanding these cases to the district court for a fresh consideration.
 
 
 89
 Vacated and remanded.
 
 
 
 *
 The Honorable William P. Gray, United States District Judge, for the Central District of California, sitting by designation
 
 
 [1]
 The Wilson Tariff Act is a less comprehensive statute than the Sherman Act, often applied in combination with it. It has been said that the statute makes explicit the prohibitions of the Sherman Act in the field of foreign commerce. United States v. General Electric Co., 80 F.Supp. 989, 1017 (S.D.N.Y.1948)
 
 
 [2]
 As specified below, other defendants have not been served and have not appeared
 
 
 [3]
 Only slightly more light on the court's reasoning is shed by a review of the transcript of the hearing, at the conclusion of which the court expressed its view as follows:
 I am of the opinion that this action is an attempt to relitigate the Honduras litigation on the basis of a rather ingenius (sic ) antitrust theory. However, even assuming the theory to have merit, I think the case of Occidental Petroleum versus Buttes Gas (331 F.Supp. 92 (C.D.Cal.1971), affirmed, 461 F.2d 1261 (9th Cir.), cert. denied, 409 U.S. 960, 950 (93 S.Ct. 272, 34 L.Ed.2d 221 (1972); gives the last Appellate view on this situation.
 I think the Act of State Doctrine does apply to the product of litigation in Honduras and I think that, under those circumstances, the motion to dismiss should be granted, and that is the order.
 Also of the opinion that this Court lacks jurisdiction on any theory of foreign commerce.
 Reporter's Transcript 79.
 
 
 [4]
 Reporter's Transcript 77-78
 
 
 [5]
 See pp. 613-15, infra
 
 
 [6]
 Perhaps if it could be shown that defendants' activities had no effect on our foreign commerce, and were intended to have none, dismissal under Rule 12(b)(1) without discovery would be sustainable. See pp. 608-16 & nn. 14 & 19 infra
 
 
 [7]
 Pazmino was initially identified incorrectly as "Louis Pasmino."
 
 
 [8]
 Ruiz was initially identified incorrectly as "Ruis."
 
 
 [9]
 Plaintiffs have, since filing the complaint, expanded and elaborated on their charges. Although our evaluation is centered on the complaint, the pleadings are to be broadly construed, and for the purpose of clarity the narrative here has drawn upon portions of the additional material
 
 
 [10]
 While recognizing the general principle, we do not necessarily endorse the strict view that American courts can never review action compelled by a foreign government. There may be occasions when such review is nonetheless justifiable, but that question is not raised here
 
 
 [11]
 Illustrations 4, 5 and 6 accompanying this comment demonstrate how a court's judgment can be, but usually is not, an act of state:
 
 
 [4]
 In a suit in tort by X against Y, a court of state A decides that X is entitled to a specified amount of damages. This decision is not an act of state within the meaning of the rule stated in this Section
 
 
 [5]
 In an action to determine title to land, brought by X against Y, a court of state A decides that X is the owner of the land. This decision is not an act of state within the meaning of the rule stated in this Section
 
 
 [6]
 State A obtains by eminent domain proceedings title to an electric utility system in its territory. The vesting of title is an act of state within the meaning of the rule stated in this Section
 As used in this Restatement, "state" refers to a sovereign nation, not to one of the United States.
 
 
 [12]
 The subject of extraterritorial jurisdiction of American antitrust laws is one about which there has been a great deal of discussion. The commentaries cited in this opinion represent only a fraction of those discussing the subject. Worthy of special comment are K. Brewster, Antitrust and American Business Abroad (1958), and W. Fugate, Foreign Commerce and the Antitrust Laws (2d ed. 1973). There has, however, been much less action. In actual litigation, jurisdiction has not often been found lacking. Up to May 1973, the Department of Justice filed some 248 foreign trade antitrust cases; not one was lost for want of jurisdiction over the activities claimed to violate the law. W. Fugate, Foreign Commerce and the Antitrust Laws, App.B. at 498 (2d ed. 1973). The instant case is, of course, a private action, but reported dismissals of such cases also appear to be infrequent. The only case lost on appeal on this ground was American Banana Co. v. United Fruit Co., 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), a decision which is today considered largely obsolete. Rahl, Foreign Commerce Jurisdiction of the American Antitrust Laws, 43 Antitrust L.J. 521 (1974)
 
 
 [13]
 For an extended discussion of this evolution, see W. Fugate, supra, at 40-43, 66-73; Report of the Attorney General's National Committee to Study the Antitrust Laws 66-76 (1955)
 
 
 [14]
 The tendency seems to be for federal regulatory statutes to contain sweeping jurisdictional language. Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, reach, respectively, "(e)very contract . . . in restraint of . . . " and "(e)very person who shall monopolize, or attempt to monopolize . . . any part of" "the trade or commerce among the several States, or with foreign nations." Although it may be "evident from the text of the antitrust statutes" that "some (actual or intended) effect on our foreign commerce is a prerequisite to jurisdiction," Occidental Petroleum, 331 F.Supp. at 102 (emphasis in original), the statutory terms themselves are not precise or limited enough to provide additional guidance to the courts. See Trautman, Appendix to Chapter 11 in K. Brewster, supra, at 313
 
 
 [15]
 Such an assertion of authority based on internal consequences is generally described as the "objective territorial" principle of jurisdiction. See W. Fugate, supra, at 35-39
 
 
 [16]
 See, e. g., A. Neale, supra, at 362-72; Haight, Comment to Miller, supra, 111 U.Pa.L.Rev. 1117, 1118-20 (1963); Ellis, Comment to Miller, supra, 111 U.Pa.L.Rev. 1129, 1129-32 (1963)
 
 
 [17]
 We note, though, that Swiss Watch and General Electric were there discussing aliens, not American citizens. Oldham said that the existence of a direct and substantial effect satisfied jurisdictional questions, but it did not say that jurisdiction could not be based on other considerations
 
 
 [18]
 Restatement § 18 reads:
 A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
 (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
 (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recognized by states that have reasonably developed legal systems.
 The "direct" and "substantial" requirements come from (b)(ii) and (iii). Comment a to this section specifically indicates, however, that this rule applies only to aliens, since United States citizens may be bound by nationality, and governs only where there has been no significant conduct within the United States, since otherwise territorial jurisdiction could be asserted.
 
 
 [19]
 This portion of Alcoa referred only to a combination of foreigners, specifically for whom the intent requirement may have been imposed, not American citizens or corporations. Further, Judge Hand's opinion noted that either intent or effect individually might suffice, but that both were present in that case, so that the question did not have to be faced
 
 
 [20]
 Both von Kalinowski and Rahl strive to bring the rule for foreign commerce closer to that for interstate commerce, about which more is said below. See pp. 612-13 infra
 
 
 [21]
 At least one observer has expressed concern that it might be quite low if economic effects can be aggregated in the manner of Wickard v. Filburn, 317 U.S. 111 (1942). Simson, The Return of American Banana : A Contemporary Perspective on American Antitrust Abroad, 9 J.Int.L. & Econ. 233, 239-40 (1974)
 
 
 [22]
 See Simson, supra, at 240-41; Rahl, supra at 524
 
 
 [23]
 See A. Neale, supra at 362-72; Simson, supra at 241-44; Fortenberry, Jurisdiction over Extraterritorial Antitrust Violations, 32 Ohio St.L.J. 519, 521, 534-36 (1971)
 
 
 [24]
 See W. Fugate, supra at 70-73
 
 
 [25]
 Indeed, few, if any, opinions have specifically employed the effects test alone or identified it as the sole criterion
 
 
 [26]
 See nn. 17-19 supra
 
 
 [27]
 This section was obviously fashioned with trade regulation problems in mind, for all five illustrations presented in the comment to this section involve such regulation. It also indicates that "jurisdictional" forebearance in the international setting is more a question of comity and fairness than one of national power
 
 
 [28]
 The risk inherent in such private suits has led one observer to suggest that they be prohibited by statute. Snyder, Foreign Investment and Trade: Extraterritorial Impact of United States Antitrust Law, 6 Va.J.Int.L. 1, 36-37 (1965)
 
 
 [29]
 K. Brewster, supra, at 446. See similar suggestions in Falk, International Jurisdiction: Horizontal and Vertical Conceptions of Legal Order, 32 Temp.L.Q. 295, 304-06 (1959); Fortenberry, 32 Ohio St.L.J. at 539-45; Simson, supra, 9 J.Int.L. & Econ. at 244-46; Trautman, The Role of Conflicts Thinking in Defining the International Reach of American Regulatory Legislation, 22 Ohio St.L.J. 586, 588 (1961); Zwarensteyn, supra, 3 Am.Bus.L.J. at 170-71 (1965); Comment, International Law: The Act of State Doctrine as a Limitation upon the Extraterritorial Application of United States Antitrust Laws, 21 J.Pub.L. 151, 158-59 (1972); Note, Extraterritorial Application of Federal Antitrust, 20 Vand.L.Rev. 1030, 1056 (1967); Comment, Extraterritorial Application of the Antitrust Laws, 70 Yale L.J. 259, 272-87 (1960). See also Restatement, Second, Conflict of Laws §§ 6, 10, 42, 50
 
 
 [30]
 See supra, pp. 605-606
 
 
 [31]
 Restatement (Second) of Foreign Relations Law of the United States § 40 states that a court should act
 in the light of such factors as
 (a) vital national interests of each of the states,
 (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person,
 (c) the extent to which the required conduct is to take place in the territory of the other state,
 (d) the nationality of the person, and
 (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.
 President (then Professor) Brewster lists these variables:
 (a) the relative significance to the violations charged of conduct within the United States as compared with conduct abroad; (b) the extent to which there is explicit purpose to harm or affect American consumers or Americans' business opportunities; (c) the relative seriousness of effects on the United States compared with those abroad; (d) the nationality or allegiance of the parties or in the case of business associations, their corporate location, and the fairness of applying our law to them; (e) the degree of conflict with foreign laws and policies, and (f) the extent to which conflict can be avoided without serious impairment of the interests of the United States or the foreign country.
 K. Brewster, supra at 446.
 
 
 [32]
 Particularly in the field of trade regulation, American laws may not be duplicated by the other nation. That does not necessarily indicate a "conflict," however, since non-prohibition does not always mean affirmative approval. See P. Areeda, supra at 127
 
 
 [33]
 Some argue that a defendant's American citizenship might be enough by itself to support jurisdiction. See Restatement (Second) of Foreign Relations Law of the United States § 30
 
 
 [34]
 In requiring district courts to assess the conflicting contacts and interests of those nations involved, we do not thereby assign them the same task which the "act of state" doctrine prohibits them from undertaking. As the quotation from comment d. to § 41 of the Restatement, Second, Foreign Relations Law of the United States (1965), see pp. 607-08, supra, makes clear, there is an important distinction between examining the validity of the "public interests" which are involved in a sovereign policy decision amounting to an "act of state" and evaluating the relative "interests" which each state may have "in providing the means of adjudicating disputes or claims that arise within its territory." Our "jurisdictional rule of reason" does not in any way require the court to question the "validity" of "foreign law or policy." Rather, the legitimacy of each nation's interests is assumed. It is merely the relative involvement and concern of each state with the suit at hand that is to be evaluated in determining whether extraterritorial jurisdiction should be exercised by American courts as a matter of comity and fairness
 
 
 [35]
 Our separation in the foreign commerce context between the degree of restraint necessary for establishing subject matter jurisdiction as opposed to that required to state a claim is, of course, not duplicated in the interstate setting, for there a "substantial" restraint is in any event necessary for the establishment of jurisdiction itself. Nevertheless, since the interstate cases provide a standard for both jurisdiction and the statement of a claim, Hospital Building Co. v. Trustees of the Rex Hospital, 425 U.S. 738, 742, n. 1 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), they thus offer some guidance for determining the degree of restraint necessary to support a claim for relief in the foreign commerce context as well, see Occidental Petroleum, 331 F.Supp. at 102-03. Although the decision whether the restraint alleged in the instant case qualifies to state a claim is for the district court in the first instance, we note that the quantitative test of substantiality is a "practical, case-by-case economic judgment," not one based on "abstract or mechanistic formulae," Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 523 (9th Cir. 1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973), and that the barrier raised is not very high. See, e. g., Hospital Building, 425 U.S. at 743-47, 96 S.Ct. 1848; United States v. Employing Plasterers Ass'n, 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954)