**ENVIRONMENTAL TECTONICS CORP., INTERNATIONAL,**
Plaintiff,

v.

**W.S. KIRKPATRICK & CO., INC., et al., Defendants.**

Civ. A. No. 86–796.

United States District Court, D. New Jersey.

May 1, 1987.

Thomas B. Rutter, and Alan Turner, Rutter, Turner & Stein, Haddonfield, N.J., for plaintiffs.

Thomas H. Sear, and Rhonda D. Orin, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, and Lawrence S. Horn, Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein, Newark, N.J., for defendant Kirkpatrick and DIC Holding.

Robert L. Krakower, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, N.J., for defendant Harry Carpenter.

Robert W. Delventhal, Crummy, DelDeo, Dolan, Griffinger & Vecchione, Newark, N.J., for defendants Emro and Ruppert.

Jerome L. Merin, Asst. U.S. Atty., Office of the U.S. Atty., Newark, N.J., for Dept. of Justice.

Dominic F. Amorosa, Short Hills, N.J., for defendant John M. Krankel.

John J. Barry, Clapp & Eisenberg, Newark, N.J., for defendant R.H. Edwards.

## OPINION

LECHNER, District Judge.

This action was brought by Environmental Tectonics Corporation, International ("ETC") against W.S. Kirkpatrick, Inc. and certain other corporations and individuals.

ETC seeks damages in connection with the award of a contract which contract ETC alleges was procured in violation of anti-trust and racketeering laws. Defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted. ETC has filed an amended complaint more specifically alleging certain aspects of the original complaint while adding and dropping certain defendants.

The motions were filed by defendants pursuant to Federal Rule of Civil Procedure 12(b)(6). With the exception of the act of state portion of these motions, it is assumed for the sole purpose of the disposition of these motions the facts alleged in the amended complaint are true and all reasonable inferences have been drawn in favor of ETC. *See D.P. Enterprises, Inc. v. Bucks County Community College,* 725 F.2d 943, 944 (3d Cir.1984). Accordingly, the description of the facts concerning these motions is based in large part upon ETC's allegations. With regard to the act of state argument, additional information has been requested from counsel and, as well, from the United States Department of State [1] which information has been considered together with the exhibits attached to ETC's brief in opposition. Therefore, this aspect of the defendants' motions will be treated as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure; all parties have been so informed and have been given an opportunity to respond. This opinion also addresses plaintiff's appeal of three orders entered by Magistrate Hedges.

## I. *Procedural History*

ETC filed a three count complaint naming the following defendants: W.S. Kirk-patrick & Co., Inc. ("Kirkpatrick") (erroneously named as W.S. Kirkpatrick, Inc.); Development International Corporation ("DIC"); DIC (Holding) Inc. ("Holding"); IDC International S.A. Luxembourg; Harry G. Carpenter ("Carpenter"); and Benson "Tunde" Akindele ("Akindele"). The complaint alleged that defendants' tactics in obtaining a contract with the government of Nigeria violated sections of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1962, *et seq.*), the New Jersey Anti-Racketeering Act (§ 2C:41–2, *et seq.*) and the Robinson-Patman Act (15 U.S.C. § 13(c) *et seq.*).

ETC filed an amended complaint which added new counts and more specifically alleged certain aspects of its original complaint. The amended complaint added the following defendants: John M. Krankel; W.S. Kirkpatrick & Co. International ("Kirkpatrick International"); International Development Corporation, S.A. ("IDC"); Emro Engineering Co., Inc. ("Emro"); Robert W. Ruppert; Ross E. Saxon; and R.H. Edwards. DIC was not named in the amended complaint. The amended complaint recited the original counts and added a defamation count against Emro and Ruppert, as well as allegations of interference with prospective contract relations against all the defendants.[2]

Kirkpatrick moved to dismiss the complaint for failure to state a claim upon which relief may be granted. Holding, DIC, Carpenter, Krankel, Kirkpatrick International, and Edwards joined the motion brought by Kirkpatrick. These defendants are referred to herein collectively as the "Moving Defendants".[3]

---

1. The Department of State was notified by telephone of this matter on September 10, 1986 (a copy of the transcript of the telephone call was made available to all parties). In addition, a copy of all relevant documents was forwarded to the Department of State on September 12, 1986. Because of numerous internal problems, the Department of State repeatedly requested extensions of the time within which to respond to the issues presented by the act of state portion of the motions. On December 10, 1986 a response of the same date was received from the Department of State.

2. This case and the motions filed were reassigned to this Court by Order, dated July 16, 1986.

3. Although the Moving Defendants' motions are brought against the sufficiency of the pleadings as set forth in the original complaint, upon review of the record the issues raised by the

The motions collectively raise four distinct issues: first, whether ETC's pleadings allege facts establishing that Carpenter and Kirkpatrick are sufficiently related to Kirkpatrick's corporate parents to warrant the inclusion of the corporate parents as defendants to this action; second, whether ETC's pleadings allege facts showing ETC suffered injury as a result of defendants' alleged antitrust and RICO violations; third, whether ETC's pleadings allege facts to establish a "pattern of racketeering activity," as required by the federal and state racketeering laws; and fourth, whether ETC's claims are barred by the act of state doctrine.[4]

## II. *Facts*

In 1954, Carpenter became an employee of Kirkpatrick, a New Jersey corporation, which is involved in the business of selling and brokering aircraft equipment and facilities. At some point prior to 1978, Carpenter became a major shareholder, Chairman of the Board of Directors and Chief Executive Officer of Kirkpatrick.

In 1978, Carpenter sold all of his stock and equity interest in Kirkpatrick to Holding. Also in 1978, pursuant to the terms of a consulting and employment agreement, Carpenter agreed to remain as Chairman of the Board and Chief Executive Officer of Kirkpatrick for a period of five years. The stock of Holding was, at all times relevant to this motion, owned by IDC, a Luxembourg corporation.

ETC is a Delaware corporation having its principal place of business in Pennsylvania and is engaged in the business of manufacturing and selling aircraft equipment and facilities.

At some point during the period 1980–1981, both ETC and Kirkpatrick or Kirkpatrick International sought to procure a contract with the Republic of Nigeria to construct an aeromedical facility at Kaduna Air Force Base in Nigeria and to provide equipment for that facility (the "Nigerian Contract"). In an effort to obtain the Nigerian Contract, Carpenter negotiated an agreement with Akindele, a Nigerian citizen (the "Akindele Agreement"), whereby Akindele was to act on behalf of certain defendants in seeking to procure the Nigerian Contract. The Akindele Agreement provided that certain defendants would pay a "commission" to two Panamanian entities controlled by Akindele if the Nigerian Contract was procured for defendants. The commission was to equal 20% of the Nigerian Contract price; a majority of the commission was to be paid, in turn, as bribes to officials of the Nigerian Government for the award of the Nigerian Contract. During this same period, ETC was negotiating with Nigerian officials to procure the Nigerian Contract, and at some point submitted a bid for the Nigerian Contract.

On March 19, 1982 the Nigerian Contract was awarded to Kirkpatrick International, a wholly-owned subsidiary of Kirkpatrick. Payments on the Nigerian Contract by the Nigerian Government began in September, 1982 and shortly thereafter defendants' payments of the agreed upon commissions to the two Panamanian entities were effected. The alleged commissions were made on four separate occasions, September 30, 1982, December 21, 1982, February 2, 1983 and August 8, 1983, and totaled approximately $2 million. ETC alleges Kirkpatrick International obtained the Nigerian Contract as a result of the commissions paid or promised as bribes to Nigerian officials who otherwise would have awarded the Nigerian Contract to ETC.

Carpenter was prosecuted for a violation of the Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd–1 *et seq.* (Supp. V 1981) ("FCPA").[5] On October 2, 1985 the United States Attorney for the District of New Jersey filed in the Carpenter matter

---

motions are properly raised against the sufficiency of the pleadings as set forth in the amended complaint. I shall consider the motions accordingly.

**4.** The results of the third and fourth issues, the RICO and the act of state portions of the motions, are applicable to those defendants who have not so moved or have not yet been served with the complaint or not yet answered the complaint.

**5.** This document and a transcript of a sentencing of Kirkpatrick for violation of FCPA were submitted by ETC in opposition to defendants' motions.

an offer of proof which was signed by Carpenter. This offer of proof establishes certain facts which include the Akindele Agreement and the payment of the commission to the two Panamanian entities in connection with the Nigerian Contract. However, the offer of proof does not establish the payment or promise of bribes to Nigerian government officials. Kirkpatrick was also prosecuted for violations of FCPA. Both Carpenter and Kirkpatrick pled guilty to violation of FCPA.

On January 6, 1986 at the sentencing of Kirkpatrick, Assistant United States Attorney Steven Levy made the following representations to the court:

Your Honor, I guess I would also like to say that the political impact of this case, of this case cannot be underestimated. ... I can say that the government of Nigeria as well as the State Department [of the United States] have shown a vital interest in this case. In fact, the State Department has been very concerned about the possible political impact upon the government of Nigeria if the Grand Jury disclosed certain information about who possibly received the payments which are set forth in the memorandum that Mr. Carpenter wrote to other senior officers of the corporation.

I have as attorney for the Government [of the United States], your Honor, been resisting attempts by the Nigerian government to find out this information because I have not had a disclosure order and the State [D]epartment has its concerns about what would happen if the government of Nigeria actually knew who was involved in this scheme to sort of rip off money from this Nigerian contract.

This is not a case where there is not a victim. Shagari, who was the president of Nigeria at the time of this contract[,] is now under house arrest. Some of these other individuals[,] and I can name them if the Court is interested, are very prominent military figures who are still in power in Nigeria. The Nigerian government would certainly like to have their names,....

(Transcript of Sentencing of Kirkpatrick, dated January 6, 1986, p. 9, 1. 21 to p. 10 1. 22) (hereinafter "Levy Representations".)

The views of the United States Department of State, dated December 10, 1986 (the "State Department Position") indicate two positions relevant to this matter:

If the adjudication of this suit were to involve a judicial inquiry into the motivation of the Government of Nigeria's decision to award the [Nigerian] contract, the Department does not believe the act of state doctrine would bar the Court from adjudicating this dispute.

. . . . .

Apart from the act of state question, however, inquires into the motivation and validity of foreign states' actions and discovery against foreign government officials may seriously affect United States foreign relations. These concerns, in the context of this litigation, counsel that caution and due regard for foreign sovereign sensibilities be exercised at each relevant stage in the proceedings. Moreover, the court should endeavor to assure that no unnecessary inquiries are made, or allegations tested, during the course of discovery or trial.

State Department Position, at 2–3 (attached as Appendix A).

The government of "Nigeria was informed not later than the end of November, 1985 [of the bribery charges with regard to the Nigerian Contract] as a result of the publicity surrounding the admissions of guilt [to violations of FCPA] and sentences with respect thereto on behalf of Kirkpatrick and Carpenter...." See submission, dated August 26, 1986, of counsel to plaintiff.

On July 31, 1986 counsel for ETC forwarded a letter to the Nigerian Embassy in Washington, D.C. to request a declaration from the Republic of Nigeria "to the effect that the prosecution of this civil action in the American Federal Courts will not have any impact whatsoever on the relations between the Republic of Nigeria and the United States of America." The stated purpose of this requested declaration was

to nullify the defendants' "act of state" argument to dismiss ETC's complaint.

To date, it appears the Republic of Nigeria has not responded to either the publicity surrounding the FCPA prosecutions or the July 31 letter nor has it taken any action with regard to the allegations surrounding the Nigerian Contract.

### III. *Discussion*

#### A. *Inclusion of Holding and IDC*

In its complaint, ETC appears to present two theories supporting the imputation of liability to Holding and IDC for the alleged wrongful acts of Kirkpatrick and Carpenter: first, that Carpenter acted as an agent of Holding and IDC when he negotiated the Akindele Agreement; and second, that Kirkpatrick was a "mere instrumentality" of Holding and IDC. Holding and IDC maintain ETC has failed to allege facts showing Holding and IDC are sufficiently related to, or responsible for, Kirkpatrick and Carpenter to support the imposition of liability on Holding and IDC for actions taken by Kirkpatrick and Carpenter. In addition, Holding and IDC maintain ETC has failed to allege facts establishing Carpenter acted as an agent, servant or employee of Holding and IDC during negotiations in connection with the Nigerian Contract. In support of their position, Holding and IDC assert that ETC's pleadings on these issues establish nothing more than Holding and IDC own Kirkpatrick and that Carpenter entered into an employment contract with Kirkpatrick and/or Holding.

■ Whether an agency relationship exists between a parent corporation and employees or officers of its subsidiary or whether a subsidiary is an instrumentality of the parent is normally a question of fact and degree. The central factual issue is control, i.e., whether the parent corporation dominates the activities of the subsidiary. See *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil, Inc.*, 456 F.Supp. 831, 840–41 (D.Del.1978). *Accord, Hoffman v. United Telecommunications, Inc.*, 575 F.Supp. 1463, 1478 (D.Kansas 1983).

■ In addressing the problem of relationships between parent and subsidiary corporations, courts have cited the criteria set forth in *Fish v. East*, 114 F.2d 177, 191 (10th Cir.1940), to aid in determining whether a subsidiary is such an instrumentality of the parent corporation that treating the two as one is warranted. *See, e.g., Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157, 161 (7th Cir.1963); *Hoffman*, 575 F.Supp. at 1478; *Japan Petroleum Co., Ltd.*, 456 F.Supp. at 841. The factors to be examined include ownership of the subsidiary's stock, identity of officers and directors of the corporations, financial arrangements of the corporations, responsibility over day-to-day operations of the subsidiary and payment of the subsidiary's salaries and expenses. These criteria aid the Court in determining whether:

> from all the facts and circumstances it is apparent that the relationship between the parent and subsidiary is so intimate, the parents control over the subsidiary is so dominating, and the business and assets of the two so mingled, that recognition of the distinct entity would result in an injustice to third-party persons....

*Hoffman*, 575 F.Supp. at 1478 (quoting from two other cases).

■ ETC's amended complaint alleges (1) that in 1978 Carpenter entered into an employment contract with Kirkpatrick and/or Holding; (2) that in 1978 Carpenter sold all of his "major" shareholdings and equity interest in Kirkpatrick to Holding; and (3) that various financial aspects of the relationships among the corporate defendants indicate they are engaged, to some extent, in a single economic enterprise.[6] Although ETC's pleadings are not exhaustive, it cannot be said, as a matter of law, the pleadings fail to allege a relationship among Holding, IDC, Carpenter and Kirkpatrick sufficient to support the potential imposition of liability upon Holding or IDC for wrongful acts committed by Carpenter and/or Kirkpatrick.

---

**6.** Specifically, the amended complaint alleges that Holding is the "manager" of Kirkpatrick and that Holding has authority over financial aspects of Kirkpatrick's operations, including payments made in connection with the Nigerian Contract.

As Holding and IDC point out in their brief, "whether an agency relationship has been created is a factual question." (Memorandum of DIC and Holding at 14.) ETC relies on *Melikian v. Corradetti*, 791 F.2d 274, 282 (3d Cir.1986) which, although not directly on point, provides some guidance: "[t]he issue of whether the corporate veil can be pierced is primarily a question of fact. Plaintiffs have alleged sufficient facts to state a claim and should be permitted to proceed with discovery to further develop the factual record." Accordingly, the ETC pleadings are adequate in this regard.

### B. *ETC's Standing*

The Moving Defendants argue that under the facts pleaded in ETC's complaint, ETC lacks standing to bring its antitrust and RICO claims against them. The Moving Defendants contend ETC's pleadings fail to establish the requisite injury because there are insufficient facts pleaded to show ETC would have won the Nigerian Contract but for the improper actions of the Moving Defendants. Although the original complaint may have been insufficient, the amended complaint pleads ETC's injury sufficiently to survive these motions to dismiss. The amended complaint alleges ETC was competing with the Moving Defendants for the Nigerian Contract and "upon information and belief", but for the alleged improprieties of the Moving Defendants, ETC would have obtained the Nigerian Contract. (Amended Complaint ¶ 40.) Absent unequivocal evidence that ETC was next in line to obtain the Nigerian Contract, ETC could not have pleaded its injury with more particularity. Facts may surface showing these allegations are untrue; for present purposes, however, ETC has alleged injury as a result of the actions of the Moving Defendants and has standing to bring its claims.

### C. *Pattern Requirement of RICO*

RICO prohibits the use or investment of funds in an enterprise involved in interstate commerce if the funds are "derived, directly or indirectly, from a pattern of racketeering activity...." 28 U.S.C. § 1962(a). RICO defines a pattern of racketeering activity as requiring "at least two acts of racketeering activity...." 28 U.S.C. § 1961(5).

ETC contends the four separate payments of the commissions and the further payment of those commissions as bribes constitute separate acts of racketeering activity to support a finding of the requisite pattern. The Moving Defendants argue RICO's "pattern" mandate requires a showing of separate criminal episodes.

Prior to the Supreme Court's decision in *Sedima, S.P.R.L. v. Imprex Co., Inc.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), courts were divided over the proper construction and application of RICO's pattern of racketeering activity requirement. Some courts held multiple criminal acts in furtherance of a single criminal scheme constituted the requisite pattern. *See, e.g., United States v. Weatherspoon*, 581 F.2d 595, 602 (7th Cir.1978) (each mailing in furtherance of scheme to defraud constitutes a separate act of racketeering, thereby establishing a pattern). Other cases held multiple criminal episodes were necessary to establish the pattern of racketeering activity requirement. *See, e.g., Teleprompter of Erie, Inc. v. City of Erie*, 537 F.Supp. 6, 12–13 (W.D.Pa.1981) (series of payments in single bribery scheme insufficient to establish RICO pattern).

The Supreme Court's *Sedima* decision offers some guidance in resolving the pattern controversy. Quoting from the Senate Report on RICO, the Court stated: "The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective.... S.Rep. No. 91–617 p. 158 (1969)." *Sedima*, 105 S.Ct. at 3285 n. 14. The Court's opinion then referred to another section of RICO providing that " 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act." *Id.*

Many courts have relied on footnote 14 of the *Sedima* opinion in declining to find a

pattern of racketeering activity where the alleged acts were committed in furtherance of a single fraudulent scheme posing no threat of continuing activity. *See, e.g., Superior Oil Co. v. Fulmer*, 785 F.2d 252, 255–57 (8th Cir.1986) (several acts of mail and wire fraud in pursuit of single isolated conversion or theft claim fail to establish requisite pattern); *Emmanouilides v. Buckthorn, Ltd.*, 642 F.Supp. 964, 966 (S.D.N.Y.1986) (several fraudulent mail and wire communications not a pattern; "rather, they are components of a single activity, the alleged vessel fraud"); *Eastern Corporate Federal Credit Union v. Peat, Marwick, Mitchell & Co.*, 639 F.Supp. 1532, 1534 (D.Mass.1986) ("In applying civil RICO, therefore, it is essential to identify threats of continuing criminal activity, as opposed to isolated criminal events."); *Temporaries, Inc. v. Maryland Nat'l Bank*, 638 F.Supp. 118, 124 (D.Md.1986) ("Without an open-ended series of activities which comprise a continuing scheme, more than one scheme should be required to establish a 'pattern' of racketeering activity"); *Kredietbank, N.V. v. Joyce Morris, Inc.*, No. 84–1903, slip op. at 8 (D.N.J. January 9, 1986) [available on Westlaw, DCTU database] ("the repetition of an act taken against a single victim or set of victims following closely on the heels of the original wrong, in some circumscribed circumstance, is completely undimensional. It suggests no expansion, no ongoing design, no continuity, such as was the target of Congress in RICO"); *Allington v. Carpenter*, 619 F.Supp. 474 (C.D.Cal.1985) (three acts of wire fraud with single victim and scheme insufficient to establish pattern); *Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc.*, 615 F.Supp. 828 (N.D.Ill. 1985) (mailing of subcontract and several kickback payments in connection with single kickback scheme insufficient to establish pattern).

Some of these courts have argued the Congressional intent behind RICO's pattern requirement was to reach only multiple criminal episodes, such an interpretation being "consistent with the connotation of multiple events implicit in the term 'pattern.'" *Carpenter*, 619 F.Supp. at 478. *See also Fulmer*, 785 F.2d at 255–57; *Inryco*, 615 F.Supp. at 831. Other courts have asserted a RICO pattern may be established by showing the existence of either (1) more than one unlawful scheme, or (2) "an open-ended continuous scheme which contains a multiplicity of predicate acts." *Temporaries, Inc.*, 638 F.Supp. at 123. *See also Eastern Corporate Federal Credit Union*, 639 F.Supp. at 1535–36; *Kredietbank*, slip. op. at 7–8.

Identification of such an "open-ended continuous scheme" requires an assessment of various factors indicative of the scheme's "continuity." Such factors include "the length of the scheme, the number of predicate acts and the number of victims of such acts, and the likelihood that the scheme would continue indefinitely." *Temporaries, Inc.*, 638 F.Supp. at 123 n. 1A. *See also, United States v. Ianniello*, 808 F.2d 184, 192 (2d Cir.1986) ("when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise [RICO pattern exists]").

The second approach for dealing with RICO's pattern requirement offers greater flexibility and appears to be more in line with the Congressional intent behind enactment of RICO. Because it is possible a single unlawful "scheme" could involve sufficient instances of "racketeering activity" amounting to a "pattern" of activity warranting liability under RICO, a blanket rule that "pattern" requires more than one scheme is unsatisfactory. An approach looking for either (1) more than one scheme, or (2) an open-ended scheme, "would prevent the propelling of isolated schemes of garden variety fraud into the domain of RICO simply because several interstate phone calls were conducted. But it will leave intact the broad remedial purposes of RICO in cases in which Congress intended to provide an extraordinary remedy—those which evidence a true pattern of racketeering activity." *Temporaries, Inc.*, 638 F.Supp. at 124.[7]

---

**7.** Some courts since the *Sedima* decision have adopted, or favorably referred to, a broad inter-

pretation of the RICO pattern. *See, e.g., R.A. G.S. Couture, Inc. v. Hyatt*, 774 F.2d 1350 (5th

■ ETC claims certain defendants engaged in mail and wire fraud and committed bribery in making the four separate payments to the Panamanian entities for payment to Nigerian officials. These four payments, however, were only in furtherance of the single alleged bribery scheme used to obtain the Nigerian Contract, a scheme which cannot be said to be ongoing or otherwise comprising a "multiplicity of predicate acts." As the cases cited above establish, such an allegation fails, as a matter of law, to set forth a pattern of racketeering activity as required by RICO.

■ The amended complaint alleges, "upon information and belief", certain defendants have engaged in other improper actions similar to those alleged to have occurred in connection with the Nigerian Contract. (Amended Complaint ¶ 57.) However, the allegation is devoid of factual support and without some such support cannot establish a RICO "pattern" of racketeering activities. RICO is, in essence, a fraud statute, and as Federal Rule of Civil Procedure 9(b) provides, the facts giving rise to allegations of fraud must be pleaded with some degree of particularity. To hold otherwise would subvert the Congressional intent behind enactment of RICO; every fraud plaintiff could assert a RICO claim simply by pleading, upon information and belief, the existence of another scheme similar to the one truly at issue.

The inherent similarity of a common law fraud action and a federal RICO action was implicitly recognized by the Third Circuit in *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786 (1984), *cert. denied*, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). In that case, the Court reversed a district court dismissal of a RICO complaint. The plaintiff in the case claimed to have been defrauded by the defendant over a twenty-one month period in connection with the sale of some 700 pieces of industrial equipment. Plaintiff claimed defendant had made numerous misrepresentations and omissions in connection with the sale of the equipment, and that such conduct established a pattern of racketeering activity as required by RICO. The district court dismissed the RICO claim because "the complaint failed to set forth 'with even minimal particularity the details of the alleged fraud or misrepresentation.'" *Id.* at 791. The Third Circuit reversed, stating:

> The complaint sets forth the nature of the alleged misrepresentations, and while it does not describe the precise words used, each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation. In sum, we conclude that [plaintiff] has alleged the fraud-based offenses with sufficient particularity to withstand a motion to dismiss under Rule 9(b).

*Id.*, (footnote omitted). By contrast, the allegation in paragraph 57 of the amended complaint in this action cannot be said to "adequately describe the nature and subject" of related racketeering activities on the party of the defendants.

■ ETC has had an opportunity to amend its pleadings so as to make a prima facie showing of the existence of a RICO pattern. Because ETC has failed to demonstrate the defendants or certain of them have engaged in a pattern of racketeering activity, the RICO claims must be dismissed.[8]

### D. *Act of State*

In their Reply Memorandum, the Moving Defendants argue the act of state doctrine bars judicial determination of ETC's claims. Specifically, the Moving Defendants contend that in order to prove violations of the Robinson-Patman Act, RICO and the New Jersey Anti-Racketeering Act or any of these statutes, ETC must establish officials

---

Cir.1985); *Systems Research, Inc. v. Random, Inc.*, 614 F.Supp. 494 (N.D.Ill.1985). However, these cases are not controlling, and, in light of the logical reasoning of the many cases cited above, they are ultimately unpersuasive.

**8.** Since ETC concedes the provisions of the New Jersey Anti-Racketeering Act are to be interpreted in the same way their RICO counterpart provisions are interpreted (Brief of ETC in Opposition to Motions to Dismiss at 16), the New Jersey Anti-Racketeering claims must also be dismissed for failure to set forth the requisite "pattern of racketeering activity."

of the Government of Nigeria were paid or knew they would be paid bribes for awarding the Nigerian Contract to Kirkpatrick, and that but for the payment of the bribes, or promise of payment, ETC would have been awarded the Nigerian Contract. The Moving Defendants argue such proof requires a judicial investigation into acts of the Government of Nigeria or would interfere with the conduct of foreign policy by the Executive Branch of the federal government, either of which is barred by the act of state doctrine.

The act of state doctrine has been defined as one of judicial abstention from an inquiry into the validity of an act by a foreign government within the scope of its sovereignty. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416, 84 S.Ct. 923, 934, 11 L.Ed.2d 804 (1964); *Williams v. Curtiss-Wright Corp.*, 694 F.2d 300, 302 (3d Cir.1982); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1292 (3d Cir.1979); *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597, 607 (9th Cir.1976), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). Over the years courts have cited several theoretical foundations for the act of state doctrine. In an early application, the Supreme Court explained the doctrine in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

This language reflects the Court's deference to the inherent nature of sovereign authority and principles of international law upon which the doctrine was traditionally applied. The Third Circuit similarly opined that an act within the sovereign power of a foreign state or by its authorized agent within the scope and authority of the office cannot be questioned or made the subject of proceedings in our courts. *Mannington Mills*, 595 F.2d at 1292.

"The Constitution sought to divide the delegated powers of the new Federal Government into three defined categories, Legislative, Executive, and Judicial, to assure, as nearly as possible, that each branch of government would confine itself to its assigned responsibility." *INS v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983). It is now also recognized the foundation of the act of state doctrine is rooted in this principle—the separation of powers among the several branches of government. *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 937–38; *Curtiss-Wright*, 694 F.2d at 303. The separation of powers rationale is illustrated by the Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino, supra.* Applying the act of state doctrine, the Court focused on protecting the basic relationships among branches of government in a system of separation of powers, and not hindering the executive's conduct of foreign policy by judicial review of foreign acts. *Id.*, at 423, 84 S.Ct. at 937–38.

The act of state doctrine has also been interpreted through "notions of comity and a conflict of laws theory that foreign law is to be accepted as the rule of decision in passing upon acts occurring within the foreign power's jurisdiction." *Mannington Mills*, 595 F.2d at 1292, *citing*, Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns*, 77 Colum.L.Rev. 1247, 1255 & n. 36 (1977). Thus, the "act of state" is deemed valid under the law of the land where it occurred and is applied as the law of the forum.

Keeping in mind the multi-faceted reasoning offered to support the act of state doctrine, a keystone in its application is the avoidance of "passing on the validity" of acts of foreign governments and the avoidance of conduct, which if effected, "may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 938. Therefore, if the inquiry presented for judicial determination includes the motivation of a sovereign act which would result in

embarrassment to the sovereign or constitute interference in the conduct of foreign policy of the United States, inquiry is foreclosed by the act of state doctrine. *Clayco Petroleum Corp. v. Occidental Petroleum Corp.*, 712 F.2d 404, 407 (9th Cir.1983), *cert. denied*, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). This has been held to be equally true of judicial inquiries which would impugn or question the nobility of a foreign nation's motivations. *Timberlane*, 549 F.2d at 607.

 The act of state doctrine should not be imposed without due consideration. In determining whether it is applicable, a court must analyze the precise nature of the conduct at issue, the affect upon the parties, and the affect upon the internal affairs of the foreign sovereign and the foreign policy of this country. *See* Restatement (2d) of Foreign Relations Law of the United States § 41, Comment d.

 In order for ETC to prevail on its claims under the Robinson-Patman Act, RICO and the New Jersey Anti-Racketeering Act, it must be demonstrated the defendants or certain of them intended to wrongfully influence the decision to award the Nigerian Contract by payment of a bribe,[9] that the Government of Nigeria, its officials or other representatives knew of the offered consideration for awarding the Nigerian Contract to Kirkpatrick, that the bribe was actually received or anticipated and that "but for" the payment or anticipation of the payment of the bribe, ETC would have been awarded the Nigerian Contract. Cf. *Radiant Burners v. Peoples Gas Co.*, 364 U.S. 656, 660, 81 S.Ct. 365, 367, 5 L.Ed.2d 358 (1960); *Clayco Petroleum*, 712 F.2d at 407; *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 76 (2d Cir.1977), *cert. denied*, 434 U.S. 984, 98 S.Ct. 608, 54

L.Ed.2d 477 (1977); *Salerno v. American League of Prof. Baseball Clubs*, 429 F.2d 1003, 1004 (2d Cir.1970), *cert. denied*, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971). Resolution of these critical issues necessarily requires judicial inquiry into the acts of the Government of Nigeria, its officials or its representatives and, as well, may affect the conduct of foreign policy of this country. *See* Levy Representations and State Department Position. Cases interpreting the act of state doctrine suggest this is the type of situation which precludes judicial inquiry.

Review of other decisions on this point begins with *Clayco Petroleum*, a case involving a strikingly similar factual situation. In *Clayco*, an oil company sued one of its competitors under the Robinson-Patman Act and other antitrust laws alleging its competitor had made secret payments to an official of Umm Al Qaywayn[10] in order to obtain an offshore oil concession. The trial court granted defendant's motion to dismiss on the ground the action was precluded by the act of state doctrine.

The Ninth Circuit found the actions complained of to be within the purview of the act of state doctrine because the sovereign activity effectuated "public" rather than private interests.[11] *Clayco Petroleum*, 712 F.2d at 406. In making the public versus private interest distinction, the court noted "[t]his case differs from those relied upon by [plaintiff], in which sovereign activity merely formed the background to the dispute or in which the only governmental actions were the neutral application of the laws." *Id.*

The actions which form the basis of ETC's complaint are analogous to those the *Clayco* court found to effect a public inter-

---

9. Decree number 38, dated November 22, 1975, of the Federal Military Government of the Republic of Nigeria lists certain prohibited corrupt practices together with the punishment for such corruption. Included within this statute is a prohibition of an individual in the employ of the government receiving or soliciting money for the showing of a favor such as the award of a contract. Decree number 38, Part I.

10. The *Clayco Petroleum* court noted the government of Umm Al Qaywayn is a foreign sover-

eign for purposes of the act of state doctrine. *Clayco Petroleum*, 712 F.2d at 405 n. 1.

11. The distinction between situations in which a government acts in a commercial rather than a public capacity, the "commercial exception" has not been accepted by a majority of the Supreme Court. See *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695–706, 96 S.Ct. 1854, 1861–1867, 48 L.Ed.2d 301 (1976) (White, J., joined by three other Justices).

est. Specifically the awarding of the Nigerian Contract by the Ministry of Defense is a decision which may only be made by the Government of Nigeria, its officials or representatives. Similarly, the offshore oil concession in *Clayco* was granted by the Government of Umm Al Qaywayn, its officials (the Petroleum Minister), or its representatives.

ETC's characterization of the act in question, as non-public or commercial, is unfounded. Whether it is the purpose or the nature of the act which determines commercial versus sovereign status, the award of the Nigerian Contract by the Government of Nigeria is a sovereign act. For purposes of applying the act of state doctrine to the present facts, the distinctions between the grant of an oil lease and the award of a military contract are not persuasive.

■ Although ETC has suggested it is not in fact complaining of the actions of the Nigerian Government, its officials or representatives, and does not characterize the Government of the Republic of Nigeria or any of its agents as "co-conspirators", an indispensible ingredient of ETC's cause of action requires establishing the involvement of the Government of Nigeria, its officials or representatives in corrupt activities which violate Nigerian law. Liability in this case cannot be attributed to any defendant unless ETC can prove the tendering and payment of the bribe to the appropriate Nigerian officials or at least, as ETC has suggested, the anticipation of such payment and reliance upon such anticipation by the appropriate Nigerian officials and thus the violation of Nigerian law by these government officials. The same considerations are relevant where the acts of a foreign sovereign are questioned directly or collaterally in litigation between private parties. *See Frazier v. Foreign Bondholders Protective Council*, 283 A.D. 44, 125 N.Y.S.2d 900, 903 (1953) ("immunity of a foreign sovereign, in all its implications, is not restricted to warding off only those assaults aimed directly at that sovereign as a party proper.").

The *Clayco* court followed *Occidental Petroleum Corp. v. Buttes Gas & Oil*, 331 F.Supp. 92 (C.D.Cal.1971), *aff'd*, 461 F.2d 1261 (9th Cir.), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972). In *Occidental* plaintiff alleged the foreign sovereign issued a fraudulent territorial decree to enable the defendants, in lieu of plaintiff, to export oil and gas in the area covered by the decree. *Occidental Petroleum*, 331 F.Supp. at 95. While noting *Occidental* involved a territorial decree not present in *Clayco*, the Ninth Circuit noted the underlying dispute in both cases concerned the decision by a foreign government authorizing the exploitation of an important natural resource. The Ninth Circuit noted "it is clear that judicial scrutiny of sovereign decisions allocating the benefits of oil development would embarrass the political branches of our government in the conduct of foreign policy." *Clayco Petroleum*, 712 F.2d at 407. Accordingly, it is not unrealistic to anticipate judicial scrutiny of the sovereign decisions of the Republic of Nigeria in allocating and awarding contracts with regard to military bases would, if not embarrass the political branches of our government, tend to make the conduct of our foreign policy with Republic of Nigeria more difficult and would require an exploration of the motive and intent of certain Nigerian governmental officials.

In determining whether to apply the act of state doctrine to this situation, ETC contends the court may inquire as to the motivation, rather than the validity, of the questioned activities. In support of this proposition, plaintiff cites *Williams v. Curtiss-Wright Corp., supra*, the Third Circuit's most recent decision in this area. The facts in *Curtiss-Wright*, however, are distinguishable and do not preclude application of the doctrine in this case.

The parties in *Curtiss-Wright* were competitors in the sale of used jet engines, parts and accessories to foreign governments. Plaintiff charged defendant with antitrust and other related state law violations. Specifically, plaintiff alleged defendant monopolized the market and engaged in the common law torts of disparagement, unfair competition, and interference with prospective economic advantage, all of which prevented plaintiff from competing in the worldwide market of reconditioned

parts for aircraft engines. *Curtiss-Wright*, 694 F.2d at 301. The complaint regarded the foreign governments, not as participants in the wrongdoing against plaintiff, but as co-victims of the alleged antitrust activity of plaintiff corporation. Accordingly, the thrust of plaintiff's challenges were the anti-competitive effects of the Curtiss- Wright activities and not the validity or motivation of the conduct of foreign governments. Resolution of plaintiff's claims did not require inquiry into the motivation of foreign governments. *Id.* at 303–304.

In contrast to the allegations of the complaint in *Curtiss-Wright*, the amended complaint filed by ETC alleges by necessary implication the involvement by high Nigerian Government officials in the corrupt practices and requires the motivation of these government officials, if not the government as an entity, be examined in order for ETC to prevail on its claims. ETC alleges Akindele acted as the local agent in Nigeria for certain of the defendants in order to secure the Nigerian Contract. As a result of Akindele's efforts the Nigerian Contract was negotiated at a rate which was allegedly twenty percent higher than would be expected in order to provide defendants with the capital to pay the commissions/bribes. In substance, the negotiations and consequent award of the Nigerian Contract, as alleged in the amended complaint, were the result of the Nigerian Government or certain Nigerian officials participating fully in the scheme and agreeing to pay an increased price in order to provide money for the bribes for various Nigerian governmental-political and military-figures.

Although the decision in *Hunt v. Mobil Oil Corp., supra,* concerned claims based upon expropriation, the judicial examination of which is traditionally recognized as barred by the act of state doctrine (such circumstances are not present in ETC's alleged complaint), *Hunt* is nevertheless instructive in the weighing process used to determine whether the act of state doctrine is to be applicable. In *Hunt* it was claimed but for an alleged conspiracy, the business of the plaintiff would have continued to thrive. The Second Circuit agreed with the District Court that such allegations "necessarily would require a wholesale examination of Libyan policy—how did it treat other companies, what provoked its 'displeasure,' how far could concessions by Hunt appease Aresident al-Qadhafi." *Hunt,* 550 F.2d at 78.

Similarly, in this case, in addition to proving the bribe was in fact paid to or anticipated by Nigerian officials, inquiry would have to be had as to the effect of the payment or promise of payment of such a bribe, whether in fact the payment or anticipation of the bribe caused the award of the Nigerian Contract to Kirkpatrick International and whether ETC could have obtained the contract had the bribe not been paid or anticipated. Inquiry into the motivation of the Nigerian government, to the extent anticipated in *Hunt,* appears to be necessary for resolution of this case.[12]

In certain situations, the act of state doctrine has been limited to discretionary, not ministerial acts of a foreign government. For example, in *Mannington Mills* the issue presented to the Third Circuit was the issuance of a patent by a foreign government. This action was regarded by the Third Circuit as ministerial or an insignificant act of the sovereign. The granting of patents *per se* was found not to be within the purview of the act of state doctrine since it is not the type of sovereign activity that would cause substantial concern to the executive or legislative branches of our government.[13] Accordingly, there was no reason to bar the suit because of foreign policy concerns. *Mannington Mills,* 595 F.2d at 1294. In this same vein, the Supreme Court decision in *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) is recognized to stand

12. In *Sage International, Ltd. v. Cadillac Gage Co.,* 534 F.Supp. 896, 908 n. 24 (E.D.Mich.1981), the court sought to distinguish a "kickback" in a situation which is not relevant to this litigation.

13. It is noted *Mannington Mills* did not create an exception to the act of state doctrine based on the ministerial-discretionary dichotomy. *See Curtiss-Wright,* 694 F.2d at 303.

for a commercial exception to the act of state doctrine. *See* n. 11, *supra.* This exception in essence acknowledges that when a government acts in a commercial mode it is not acting as a sovereign and therefore the doctrine is inapplicable.

 *Clayco Petroleum* is also significant because the Court distinguished application of FCPA and indicated the FCPA is not an exception to the act of state doctrine. *Clayco Petroleum* indicates FCPA was intended to stop bribery and noted both the Justice Department and the Securities and Exchange Commission share enforcement responsibilities under FCPA. The opinion noted that any governmental enforcement represents a judgment of the Executive Branch on the wisdom of bringing a proceeding in light of the exigencies of foreign affairs. Act of state concerns are thus inapplicable, to the extent of a FCPA prosecution, since the purpose of the doctrine is to prevent the judiciary from interfering with the conduct of foreign affairs. *Clayco Petroleum,* 712 F.2d at 408–409, *citing, Sabbatino,* 476 U.S. at 423, 84 S.Ct. at 937–38; *Timberlane,* 549 F.2d at 605. *Clayco Petroleum* also suggests it is the screening of governmental proceedings, with state department consultation, which distinguishes FCPA enforcement from private suits. In private suits, the act of state doctrine remains necessary to protect proper conduct of national foreign policy. *Id.* 712 F.2d at 409.

██ Significantly, prosecution was had against both Carpenter and Kirkpatrick. The offer of proof executed by Carpenter is carefully worded and does not establish any bribes were in fact paid to a member of the Nigerian Government although it adequately sets forth the requirements to establish Carpenter intended such action to take place. Thus, a violation of FCPA was demonstrated. Likewise, the transcript with regard to the sentencing of Kirkpatrick for the violation of FCPA sets forth the concern of the United States Government and the lack of a disclosure order from the State Department with regard to the allegations of bribery concerning the Nigerian Contract. Read together, these documents indicate a conscious decision on behalf of the Executive Branch through the Department of State for a limited prosecution under FCPA (limited in the amount of disclosure of facts) and the efforts of the Government in resisting attempts by the Nigerian Government in discovering information with regard to what Carpenter knew of the payment of the bribes.[14]

 In light of the State Department Position, ETC has suggested application of a form of the so-called "Bernstein" exception to the act of state doctrine.[15] The State Department Position indicates: "As the Department understands the allegations in the instant suit, the validity of the Nigerian Government's decision to award the contract in question is not in question." Additionally, the State Depart-

---

**14.** In addition to all of the allegations in the amended complaint which allege by necessity Nigerian Government involvement, Article XX of the Nigerian Contract provides that "[t]his Agreement shall be governed, interpreted and controlled by the laws of the Federal Republic of Nigeria...." In Article XXI of the Nigerian Contract provides for disputes "to be submitted to an Arbitration Court convened under the rules as provided under the Arbitration Laws of Nigeria...." To date, the government of the Republic of Nigeria has not taken any steps to repudiate the acts of its governmental officials. This inaction is significant.

It has been noted in two decisions that unreputed acts of a foreign government can be scrutinized if they resulted from corruption of government officials. *Sage Intern,* 534 F.Supp. at 910; *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F.Supp. 680, 690 (S.D.N.Y.1979). *Sage* relies upon *Gulf & West-*

*ern* and *Gulf & Western* cites *Hunt,* 550 F.2d at 79 as authority for this statement. However, *Hunt* specifically states: "This appeal therefore is not the proper vehicle for consideration of international commercial bribery insofar as it affects the act of state doctrine." *Id.*

**15.** In *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 768, 92 S.Ct. 1808, 1813–14, 32 L.Ed.2d 466 (1972) (Brennan, J., dissenting) *reh'd denied,* 409 U.S. 897, 93 S.Ct. 92, 34 L.Ed.2d 155 (1972) a plurality of the Supreme Court adopted the "Bernstein" exception. "[W]here the Executive Branch, charged as it is with primary responsibility for the conduct of foreign affairs, expressly represents to the Court that application of the act of state doctrine would not advance the interests of American foreign policy, that doctrine should not be applied by the courts." *Id.*

ment states that judicial inquiry into "motivations of the Government of Nigeria's decision to award the [Nigerian C]ontract" would not be precluded by the act of state doctrine. The State Department Position, however, goes on to note inquiries into the motivation and validity of actions by foreign states and discovery against foreign government officials may seriously affect United States foreign relations. (Appendix A). As such the State Department fails to clearly "sign off" on the application of the act of state doctrine in this case.

> The State Department opines that:
> inquiries into the motivation and validity of foreign states' actions and discovery against foreign government officials *may seriously affect United States foreign relations.* These concerns, in the context of this litigation, counsel that caution and due regard for foreign sovereign sensibilities be exercised at *each relevant stage* in the proceedings. Moreover, *the court should* endeavor to *assure* that *no unnecessary inquiries* are made, *or allegations* tested during the course of discovery or trial.

(Appendix A, emphasis added). It is significant that in light of this caution, *this court* is urged "to assure that no unnecessary inquiries are made, or allegations, tested during the course of discovery or trial." [16] *Id.*

■ The overview and judgments of this court, as urged by the State Department, may well have a significant impact on the foreign affairs of this country—an area of decision-making the Constitution largely commits to the discretion of the Executive. Before launching investigations on foreign soil, or of foreign nationals, or of matters implicating international diplomacy, the Executive has the option to weigh the implications of such conduct on the overall foreign policy of this country. This obviously will not happen in the scenario suggested by the State Department Position.

■ Equally important to this court's determination of whether the parties to this matter are making unnecessary inquiries or testing unnecessary theories is whether there is any risk to national security. The Executive Branch must make the decisions as to whether disclosure of facts will have any ramification on disclosure of intelligence sources as well as on diplomatic relations. In this regard, as noted earlier, Carpenter's offer of proof upon which his criminal conviction for violating FCPA is based is carefully and narrowly worded. It cannot be said such careful wording is without intent or significance. See, the Levy Representations.

The significance of the impact of this case on the Government of Nigeria (see the Levy Representations) and on the conduct of this country's foreign policy (see the State Department Position) is obvious. The suggestion of the State Department that this court conduct the litigation with an eye to foreign policy concerns is not appropriate. Such a precedent poses a serious threat to the authority of the Executive Branch to conduct foreign policy.[17]

---

**16.** For example, a consideration of this concern of the State Department clearly would have to include the issuance of a subpoena for records in Nigeria. Since such an action may well affect the foreign relations of this country, a court must weigh the interests of this country and Nigeria before issuing such a subpoena. A court must give "deference to the determination by the Executive Branch—the arm of the government charged with primary responsibility for formulating and effectuating foreign policy—that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure." *United States v. Davis,* 767 F.2d 1025, 1035 (2d Cir.1985) (citations omitted). This is not what is suggested by the terms of the State Department Position.

**17.** No individual who is responsible for or knowledgeable of this nation's foreign policy or security will be in a position to know of the pretrial and trial decisions and evaluate their impact on foreign policy. Moreover, even if such person were available to the court, counselling the court for or against such decisions would pose serious problems of, at the least, an appearance of impropriety. Moreover, such a procedure (although not explicitly suggested by the State Department) would bring the basic separation of powers rule into question. "If there is a principle in our Constitution, indeed in any free Constitution, more sacred than another, it is that which separates the Legislative, Executive and Judicial powers." 1 Annals of Congress 581, (quoted in *Myers v. United States,* 272 U.S. 52, 116, 47 S.Ct. 21, 25, 71 L.Ed. 160 (1926)).

Article III courts must " 'carefully abstain from exercising any power that is not strictly judicial in its character, and which is not clearly confided to [them] by the Constitution.' " *Muskrat v. United States,* 219 U.S. 346, 355, 31 S.Ct. 250, 253, 55 L.Ed. 246 (1911) (citation omitted). The essence of judicial power is the resolution of cases or controversies. *Id.* at 356, 31 S.Ct. at 253. There is a notable absence of Constitutional authority for a court to assume responsibility for the conduct of a segment of foreign policy, which is what the State Department suggests.

Neither Congress nor the Executive may vest in or assign to judges holding office under Article III powers beyond those clearly confined to them by the Constitution. Nor may courts exercise such powers if granted or delegated. *See Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976); *Muskrat,* 219 U.S. at 356, 31 S.Ct. at 253–54; *Ex Parte Siebold,* 100 U.S. (10 Otto) 371, 398, 25 L.Ed. 717 (1879).

There are foreign policy considerations involved in ETC's proving its cause of action. Proof by ETC requires, as mentioned, establishment of corruption by high Nigerian Government and military officials and necessarily implies a criticism of the Republic of Nigeria with regard to its failure to date to take action against government officials involved and/or other individuals involved. The July 31 letter from counsel to ETC to the Republic of Nigeria requesting a declaration of approval with regard to this civil litigation, even if a Nigerian response is forthcoming, is not dispositive of the issues. Indeed, it is the conduct of foreign policy by the Executive and Legislative Branches of this Government which must be controlling.

▇▇▇ ETC's amended complaint is aimed at alleged antitrust and RICO violations of defendants which require inquiry into the actions, conduct and motivation of the Republic of Nigeria and its agents. Although "[t]he act of state doctrine should not be applied to thwart legitimate

American regulatory goals in the absence of a showing that adjudication may hinder international relations[,]" *Curtiss-Wright,* 694 F.2d at 304 (citation omitted), I am satisfied the Moving Defendants have established[18] the actions, conduct and motivation of the Republic of Nigeria and its agents are "... basic and fundamental to the alleged antitrust [,RICO and other] behavior and [are] more than merely peripheral to the overall [alleged] illegal course of conduct." *Mannington Mills,* 595 F.2d at 1293. Moreover, the suggestion of the State Department is neither practical nor constitutional. The motion to dismiss because of the act of state doctrine is granted.

**E. *Appeals of Magistrate's Orders***

**1. *Standard of Review***

▇▇▇ Also before the Court are three appeals of orders entered by Magistrate Hedges, two of which are discovery related and the third sustains Carpenter's claim of privilege against self-incrimination which defendant asserted at his deposition. In considering each of the three appeals, the Court must apply the standard of review of a magistrate's order as set forth at 28 U.S.C. § 636(b)(1)(A), Fed.R.Civ.P. 72(a), and Rule 40(A) of the Local Rules of the United States District Court for the District of New Jersey. The Third Circuit has held a magistrate's order can be set aside only if it is found to be clearly erroneous or contrary to law. *Cipollone v. Liggett Group, Inc.,* 785 F.2d 1108, 1113 (3d Cir. 1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

▇▇▇ "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire *record* is left with the definite and firm conviction that a mistake has been committed." *Agricultural Services Assn., Inc. v. Ferry-Morse Seed Co.,* 551 F.2d 1057, 1071 (6th Cir.1977), *quoting United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). Several courts

18. It is the burden of the Moving Defendants to establish the applicability of the act of state doctrine. *Curtiss-Wright,* 694 F.2d at 303 n. 4,

*citing Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 684, 96 S.Ct. 1854, 1856, 48 L.Ed.2d 301 (1976).

have also held that a magistrate's order in a discovery dispute is subject to great deference and will only be reversed if found to be an abuse of discretion. *See Detection Systems, Inc. v. Pittway Corp.*, 96 F.R.D. 152, 154 (W.D.N.Y.1982); *Empire Volkswagen Inc. v. World-Wide Volkswagen Corp.*, 95 F.R.D. 398, 399 (S.D.N.Y.1982), *aff'd* 814 F.2d 90 (2d Cir.1987).

### 2. *Appeal from the May 30, 1986 Order*

ETC appeals from an order entered by Magistrate Hedges on May 30, 1986 [19], which stayed plaintiff's discovery pending disposition of the motions to dismiss.

 The court converted the defendants' motion to dismiss into a summary judgment motion only on the limited question of the applicability of the act of state doctrine because of the additional submissions. In response, ETC filed the instant appeal on the incorrect assumption that additional discovery on the act of state is necessitated. Accordingly, ETC appeals on the ground that the magistrate's order is "an abuse of discretion and contrary to law" (ETC's Notice of Appeal) because ETC is deprived of conducting discovery which may produce facts relevant to the act of state issue. However, applicability of the act of state doctrine (*see* Section D) is purely a legal question, the resolution of which requires no further factual development. Furthermore, additional discovery is inconsistent with the conclusions regarding the act of state doctrine. The taking of discovery by ETC would necessarily involve inquiry into the action of the Nigerian Government and its officials.

Applying the limited standard of review mentioned previously, ETC has not demonstrated the magistrate's order is clearly erroneous or contrary to law. Only after the court posed questions to counsel regarding the act of state question did ETC seek further discovery which was unnecessary for the motion. At the present juncture, additional discovery is contrary to the application of the act of state doctrine. Accordingly, the magistrate's order is affirmed.

### 3. *Appeal of the July 16, 1986 Order*

 During his June 30, 1986 deposition Carpenter asserted his privilege against self-incrimination and refused to answer certain questions. Magistrate Hedges sustained Carpenter's claim of privilege in a Letter-Order and Opinion, dated July 16, 1986. This appeal followed.[20]

Prior to his deposition, Carpenter submitted an affidavit (the "Carpenter Aff.") setting forth his reasons for fearing criminal prosecution in Nigeria and detailing the factual bases for assertion of the privilege. As discussed earlier in this opinion, defendants Kirkpatrick and Carpenter both pled guilty to violations of the FCPA in connection with the Nigerian Contract. According to Akindele, Carpenter's plea and sentencing were receiving considerable media coverage and were "front page news" in Nigeria. Apparently, local news coverage of Carpenter's plea and sentencing were subsequently reported by Nigerian newspapers. (Carpenter Aff., ¶ 2) Akindele also told Carpenter of certain Nigerian government officials' desire to prosecute Carpenter in connection with the Nigerian Contract. (*Id.* at § 3) Akindele further warned Carpenter not to travel to Nigeria and to exercise extreme care in travelling in Europe or Africa because there was a risk he would be taken by force to Nigeria. (*Id.* at ¶ 4)

In January, 1986, Carpenter's attorney was informed by a United States Government official that "the Nigerians wanted to get [Carpenter] to Nigeria." (*Id.* at ¶ 5) This information, which originally came from Interpol, was relayed to Carpenter.

---

**19.** This appeal was not filed within the time limit prescribed by Local Rule 40(D)(4)(a), however, due to the somewhat confusing circumstances surrounding these motions, it shall be considered. The Affidavit of Alan A. Turner dated September 10, 1986, and the Memorandum of Law in Support of the Notice of Appeal submitted in connection with this motion detail the facts regarding these circumstances.

**20.** Disposition of the appeal was postponed until oral argument and decision on the motion to dismiss.

(*Id.* at ¶ 5) Carpenter has since been again warned not to travel abroad "and that the Nigerian interest in [his] case has not abated." (*Id.* at ¶ 6)

In sustaining Carpenter's Fifth Amendment privilege, Magistrate Hedges applied the guidelines set forth in *United States v. Flanagan*, 691 F.2d 116 (2d Cir.1982). In *Flanagan*, defendant was subpoenaed to appear before a federal grand jury which was investigating an alleged gun-smuggling conspiracy in operation for the benefit of the Irish Republican Army in Ireland. After his intent to invoke the Fifth Amendment was known, defendant Flanagan was granted immunity from the use of his testimony against him in any subsequent criminal proceeding. *Id.* at 119.

Flanagan's motion to quash the subpoena was based in part on the argument that because the grant of immunity would not protect him from prosecution in foreign countries, a protection coexistive with the Fifth Amendment privilege. Although the Second circuit found "Flanagan's fear of foreign prosecution, viewed objectively, [to be] remote and speculative rather than real, reasonable, or substantial" *id.* at 122, the court's discussion of factors to be considered in making such a ruling is helpful.

Among the factors detained in *Flanagan* are the "reality or remoteness of the risks of incrimination under foreign law" *id.*, the existence of foreign laws authorizing prosecution of the criminal acts in question, whether the testimony may enable the foreign government to seek extradition, and whether the testimony is likely to be disclosed. *Id.* at 120–23. In his decision, Magistrate Hedges considered these factors as applied to Carpenter and concluded the privilege should be upheld.

On appeal, ETC contends the protection afforded by the Fifth Amendment is not available to Carpenter because he has already pled guilty to a violation of the Foreign Corrupt Practices Act. Furthermore, ETC disputes the existence of a real threat of prosecution. Alternatively, ETC suggests the testimony should be taken under a protective order.

The Fifth Amendment guarantees every person freedom from self-incrimination and protects a witness against providing testimony "leading to the inflictions of penalties affixed to ... criminal acts." *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32 L.Ed.2d 212 (1972) *reh'g denied*, 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972) (citations omitted). The protection is available where the testimony "would furnish a link in the chain of evidence needed to prosecute" the witness for a crime, provided "the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). Consideration of ETC's arguments necessitate a review of the standard for invoking claims of the Fifth Amendment privilege.

The extent to which the Fifth Amendment privilege may properly be asserted on the grounds of potential prosecution in foreign countries is unclear. *United States v. Kowalchuk*, No. 77–118, slip op. (E.D.Pa. Oct. 20, 1978).[21] There is, however, agreement that the Fifth Amendment only protects against real and substantial threats of incrimination, not speculative or theoretical possibilities. *Zicarelli v. New Jersey Investigation Commission*, 406 U.S. 472, 478, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972). In assessing the severity of threat, one court has found there to be a

> common theme to all of the reported cases in that questions relating directly to criminal activities in foreign countries pose a more serious threat of incrimination than do questions about events and activities within this country having only direct and remote connection to foreign culpability.

*Kowalchuk*, slip op. at 4, citing *In re Parker*, 411 F.2d 1067 (10th Cir.1969), *vacated as moot, Parker v. United States*, 397 U.S. 96, 90 S.Ct. 819, 25 L.Ed.2d 81 (1970); *In re Cardassi*, 351 F.Supp. 1080 (D.Conn.1972).

---

**21.** This unreported decision was included in Carpenter's opposition to the appeal and was therefore available to all counsel.

ETC contends the Fifth Amendment protection is not available to Carpenter in light of Carpenter's previous plea of guilty to violation of the FCPA. This argument is not persuasive for two reasons. First, there would be no need to depose Carpenter if the information sought had been disclosed in connection with Carpenter's earlier prosecution. It is logical then to assume the requested information goes beyond the investigation under the FCPA. Therefore, Carpenter may invoke the Fifth Amendment to avoid further incrimination. Second, case law supports protection of Carpenter's testimony because prior disclosure is not held to be a waiver of the privilege. *United States v. Yurasovich*, 580 F.2d 1212, 1218–1220 (3d Cir.1978).

> The initial statement is incriminating, a subsequent statement on the same subject would necessarily be further incriminating because the second statement would corroborate the earlier statement, making it more difficult for the witness to discount the earlier statement and hence increasing the danger of conviction.

*Carter-Wallace, Inc. v. Hartz Mountain Industries, Inc.*, 553 F.Supp. 45, 49 (S.D.N.Y.1982) *quoting E.F. Hutton & Co. v. Jupiter Development Corp.*, 91 F.R.D. 110, 115 (S.D.N.Y.1981).

■■■ ETC also challenges Carpenter's assertion of the Fifth Amendment on the ground that Carpenter's fear of foreign prosecution is not founded. This argument ignores certain relevant facts. As previously detailed, Carpenter has been informed on more than on occasion of the danger he faces by travelling in Europe or Africa (Carpenter Aff. at ¶ 4) and of Nigerian official's desire to prosecute him. (*Id.* at ¶ 3) These facts are not properly ignored because determinations as to whether the privilege is justified are to be made by the trial court based on the particular circumstance of each case. *Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed.2d 1118 (1951).

■■■ Furthermore, contrary to ETC's contentions, a pending foreign prosecution is not a prerequisite to Fifth Amendment protection. *See Kawalchuk*, slip op. at 8 ("[t]he actual pendency of criminal proceed-

ings is not a prerequisite to the successful invocation of the Fifth Amendment privilege."), *In re Cardassi*, 351 F.Supp. at 1085 (interpreting *Zicarelli*, not to require any indication that a foreign prosecution is "imminent.").

The magistrate's decision to uphold Carpenter's Fifth Amendment claim has not been shown to be clearly erroneous or contrary to law. Based on the magistrate's thorough discussion and this court's independent analysis of the relevant facts and applicable case law, the magistrate's decision shall be affirmed.

### 4. *Appeal of the January 20, 1987 Order*

As part of discovery, ETC issued a deposition notice and subpoena *duces tecum* to Steven Levy, an attorney with the Department of Justice. ETC sought Mr. Levy's deposition and production of materials obtained by Mr. Levy in connection with an ongoing grand jury investigation. The United States of America ("the Government") moved to quash the subpoena pursuant to Rule 26(c) Fed.R.Civ.P.

On January 20, 1987, Magistrate Hedges granted in part and denied in part the Government's motion to quash, and ETC appealed. At oral argument it was determined the issues on appeal had been rendered moot because the subpoena was withdrawn. (3/6/87 Tr. 61:6–13)

### *Conclusion*

Because ETC's amended complaint alleges facts sufficient, for the purposes of these motions to dismiss the pleading, to establish a relationship among Holding, IDC, Carpenter and Kirkpatrick to support the potential imposition of liability upon Holding and IDC for wrongful actions of Carpenter and Kirkpatrick, the motion to dismiss Holding and IDC as defendants is denied.

Because ETC's amended complaint alleges that ETC failed to procure the Nigerian Contract because of the alleged antitrust and RICO violations committed by defendants, the motion to dismiss those claims for lack of standing is denied.

Because ETC has failed to allege in its pleadings facts establishing a pattern of racketeering activity as required under RICO and the New Jersey Anti-Racketeering statutes, the motion to dismiss ETC's anti-racketeering claims is granted.

Because of the act of state doctrine, the motion to dismiss ETC's complaint against the defendants is granted.

The parties have agreed to dismiss without prejudice counts five and six of the complaint.[22] Accordingly, counts one, two, three, four and seven are hereby dismissed with prejudice; counts five and six are dismissed without prejudice pursuant to agreement of counsel.

### APPENDIX A

United States Department of State

The Legal Adviser

Washington, D.C. 20520

December 10, 1986

The Honorable
Alfred J. Lechner, Jr.
United States District Court Judge
District of New Jersey
U.S. Post Office and Courthouse
Newark, N.J. 07101

Re: *Environmental Tectonics Corporation, International v. W.S. Kirkpatrick & Co. Inc., et al.,* Civil Action No. 86–796

Dear Judge Lechner:

I am writing on behalf of the Department of State in reply to the Court's invitation to the Department to express its views of the above-referenced civil action in light of defendant's motion to dismiss on the basis of the act of state doctrine. This court has indicated in particular that it might become necessary to examine the motivation of officials of the Republic of Nigeria in taking certain public actions. The Department appreciates the Court's consideration in offering this opportunity for comment.

In recent years, the United States Executive Branch has addressed the question of whether the act of state doctrine requires dismissal of proceedings that may call for judicial inquiry into the *motivations* (as opposed to the legal validity) of the public acts of foreign states. Specifically, as the United States stated in an *amicus curiae* brief before the United States Supreme Court:

> [W]hile judicial examination of purpose may on occasion implicate some of the concerns underlying the act of state doctrine, that doctrine only precludes judicial questioning of the *validity* or *legality* of foreign government actions....
>
> None of this Court's decisions suggest that the act of state doctrine precludes all judicial inquiries that may embarrass a foreign state or affect the political branches' conduct of foreign relations. Rather, the act of state doctrine is based on the need to avoid unprincipled decisions resulting from the absence of legal standards, and the unique embarrassment, and the particular interference with the conduct of foreign affairs, that may result from the judicial determination that a foreign sovereign's acts are invalid. Judicial inquiry into the purpose of a foreign sovereign's acts would not require a court to rule on the legality of those acts, and a finding concerning purpose would not entail the particular kind of harm that the act of state doctrine is designed to avoid. Dismissal of a complaint before the development of evidence, merely because adjudication raises the bare possibility of embarrassment, constitutes an unwarranted expansion of the act of state doctrine and is contrary to the flexibility with which that doctrine should be applied. (Emphasis added).

*See* United States Government briefs *amicus curiae* in support of petitions for a writ of *certiorari* in *Industrial Investment Development Corp. v. Mitsui & Co., Ltd.,* 594 F.2d 48 (5th Cir.1979), *cert. denied,* 445 U.S. 903 (1980); and in *Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir.1977), *cert. de-*

---

**22.** See letter of March 16, 1987 from counsel on behalf of Emro and Ruppert to counsel for plaintiff.

*nied,* 434 U.S. 984 (1977), excerpts *reprinted in* 1979 *Digest of U.S. Practice in International Law* at 965 and 969, respectively.

These statements represent our views. As the Department understands the allegations in the instant suit, the validity of the Nigerian Government's decision to award the contract in question is not in question. If the adjudication of this suit were to involve a judicial inquiry into the motivations of the Government of Nigeria's decision to award the contract, the Department does not believe the act of state doctrine would bar the Court from adjudicating this dispute.

Moreover, the Department is of the view that the act of state doctrine may not apply to the award of the contract in question, to the extent that such award does not constitute a sufficiently formal expression of Nigeria's public policy or interests. *See, e.g., Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 695 (1976); *compare Sage Int'l., Ltd v. Cadillac Gage Co.,* 534 F.Supp. 896, 908 (E.D.Mich.1981) *with General Aircraft Corp. v. Air America, Inc.,* 482 F.Supp. 3 (D.D.C.1979).

Apart from the act of state question, however, inquiries into the motivation and validity of foreign states' actions and discovery against foreign government officials may seriously affect United States foreign relations. These concerns, in the context of this litigation, counsel that caution and due regard for foreign sovereign sensibilities be exercised at each relevant stage in the proceedings. Moreover, the court should endeavor to assure that no unnecessary inquiries are made, or allegations tested, during the course of discovery or trial.

I hope this letter will be helpful in your disposition of the above-referenced action.

Sincerely,
/s/ Abraham D. Sofaer
Abraham D. Sofaer